GEORGE F. KUGLER, JR., ATTORNEY GENERAL OF NEW JERSEY, PLAINTIFF-APPELLANT, v. RICHARD RO-MAIN, BOTH INDIVIDUALLY AND t/a EDUCATIONAL SERVICES CO., DEFENDANT-RESPONDENT.

Argued April 5, 1971—Decided June 28, 1971.

*Mr. Douglas J. Harper,* Deputy Attorney General, argued the cause for appellant (*Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

*Mr. Carl R. Lobel,* argued the cause for New Jersey State Office of Legal Services, *amicus curiae* (*Mr. Carl F. Bianchi,* attorney).

*Mr. Nathan N. Goldberg* argued the cause for respondent.

The opinion of the Court was delivered by

FRANCIS, J. Acting under the Consumer Fraud Act, *N. J. S. A.* 56:8–1 *et seq.*, the Attorney General instituted this action in the Superior Court, Chancery Division, against defendant Richard Romain individually and trading as Educational Services Co. Injunctive and other affirmative relief was sought based on charges that in connection with the house-to-house sale of certain so-called educational books defendant had engaged in business practices which violated Section 2 of the Act, *N. J. S. A.* 56:8–2. Section 2 provides in pertinent part as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale * * * of any merchandise, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; * * *.

The specific authorization for this proceeding appears in *N. J. S. A.* 56:8–8:

> Whenever it shall appear to the Attorney General that a person has engaged in, is engaging in or is about to engage in any practice declared to be unlawful by this act he may seek and obtain in an action in the Superior Court an injunction prohibiting such person from continuing such practices or engaging therein or doing any acts in furtherance thereof * * *. The court may make such orders or judgments as may be necessary to prevent the use or employment by a person of any prohibited practices, or which may be necessary to restore to any person in interest any moneys or property, real or personal which may have been acquired by means of any practice herein declared to be unlawful.

The Attorney General prayed for (1) injunctive relief barring the specific practices allegedly violative of *N. J. S. A.* 56:8–2; (2) a declaration that the price of the books printed in the form of contract was a transgression of the statute either because it constituted a fraud within the ex-

press terms of *N. J. S. A.* 56:8–2 or because it was unconscionable under the Uniform Commercial Code, *N. J. S. A.* 12A:2–302 which he argued is implicitly included within *N. J. S. A.* 56:8–2; (3) restoration and remedial orders for all persons who were induced to execute such purchase contracts; (4) rescission of all contracts with purchasers listed on a schedule attached to the complaint; (5) imposition of civil penalties against defendant, as provided in the Act, *N. J. S. A.* 56:8–13, 14; and (6) an order restraining defendant from doing business in New Jersey until he registered his trade name as required by *N. J. S. A.* 56:1–2.

The relief sought was not limited to the 24 customers whose names were set out in the schedule referred to. The complaint asked for

(3) An order enjoining defendant from enforcing or collecting in any manner those obligations arising out of the contracts entered into with those consumers set forth in Schedule A and *those consumers similarly situated.*

(4) An order rescinding any and all obligations arising out of the purported contracts entered into by those consumers set forth in the attached schedule and *those consumers similarly situated.* (Emphasis added.)

After a plenary hearing, the trial court found that defendant violated *N. J. S. A.* 56:8–2 by using deceptive and fraudulent practices to induce the 24 customers named in the schedule to execute contracts for the purchase of an "educational package" of books and related materials. Accordingly, a judgment was entered in favor af the Attorney General granting certain specified injunctive, restorative and remedial relief which will be discussed more fully hereafter. *Kugler v. Romain,* 110 *N. J. Super.* 470 (Ch. Div. 1970). Believing that the relief granted was not as extensive as the circumstances warranted, the Attorney General appealed from the trial court's judgment. Defendant cross-appealed but abandoned his appeal before argument and limited his participation to a defense of the portions of the judgment attacked by the Attorney General. We certified the cause on

our own motion before the appeal was heard in the Appellate Division.

The trial court's reported opinion contains a substantial outline of facts and findings thereon, as well as a comprehensive discussion of the legal issues involved, with most of which we are in agreement. However, since we have concluded that full effectuation of the statute, *N. J. S. A.* 56:8–1 *et seq.*, and of the remedies intended to be made available thereby to the merchandise-consuming public requires more extensive remedial application, it is necessary to set forth some factual background relating to defendant's business practices and methods of operation.

Defendant, a resident and member of the bar of the State of New York, was engaged in the installment sale of so-called educational books and related materials in New York and New Jersey. He operated under the trade name Educational Services Company from an office in New York City. The trade name was not registered in New Jersey as required by *N. J. S. A.* 56:1–2 as a condition to doing business here.

Sales solicitations were made exclusively through house-to-house canvass by defendant's employees. No advance appointments were made. The solicitors simply descended upon a selected section of a municipality and undertook by house-to-house calls to sell a package of books which was described in large type on the contract presented to the prospective customers as "A Complete Ten Year Educational Program." It was also indicated thereon that the package was the product of the "Junior Institute," and nearby was the plea "Give your child its chance." In engaging his sales personnel, defendant sought persons who were "sales oriented" and extroverted. They were trained by defendant and his sales manager. The sales force fluctuated in number depending upon the season; the number was greater in the summer, reaching 30-35 persons. Defendant's "crew leader" transported them by car to the New Jersey area to be covered.

The geographical areas to be the subject of sales solicitation were primarily the urban centers of Newark, Paterson, Eliza-

beth and Rahway. They were chosen by defendant who was familiar with them and the class of people to be sought out by his sales force. Within these target areas, the sales solicitations were consciously directed toward minority group consumers and consumers of limited education and economic means. Persons with incomes of less than $5000 a year were favored; some buyers were welfare recipients. Sales among these people were thought to be "easier." Although the canvassing was door-to-door, ordinances in the municipalities involved in this case which required licensing or registration were ignored.

Defendant's educational package consisted of the following books and materials:

1. Questions Children Ask (1 Vol.)
2. Child Horizons (4 Vols.)
3. New Achievement Library (5 Vols.)
4. High School Subjects Self-Taught (4 Vols.)
5. Science Library (1 Vol.)
6. Play-Way French and Spanish Records (2 45 r.p.m. Records)
7. Tell Time Flash Card Set.

Additionally a "bonus" volume—a Negro History, a World Atlas or a Bible—was offered either along with the original package or after completion of payment.

The printed contract form marked "Retail Installment Obligation," which was presented to the customer for signature, consisted of a single sheet covered with printed matter on both sides. The cash and time sale prices were printed on the face of the contract, the former at $249.50, and the latter at $279.95, less a $9 down payment which was obtained whenever possible. Apparently no one paid the cash price.[1] Also printed on the face in small print was the statement: "This order is not subject to cancellation and set is not returnable."

_____

[1] The contract provided for payment of the $279.95, less the $9 deposit, in 24 equal monthly installments of $11.50 each. As the Attorney General points out, 24 x $11.50 equals $276.

On the reverse side under "Conditions" appeared certain payment acceleration and waiver of defenses clauses, including waiver of all exemptions and right to jury trial. It is noted also that on the face of the form in large print appears "Credit Life Insurance at no additional charge" and "Property Insurance Certificate at no additional charge." Moreover, in the sales price computation column, which likewise appears on the face of the contract, "Credit Life Insurance" and "Property Insurance" are listed again with the notation "No Add. Chg." But on the reverse side under "Conditions," it is noted in small type that the insurance is not provided unless a charge is made for it in the price computation column "on the face hereof."

The trial court found that the wholesale price for the basic package, including the bonus items, was $35 to $40. Thus the cash sale price was six or seven times the wholesale price. Defendant's sales personnel were paid on a commission basis, ranging from $16.50 to $33 per sale; the amount paid depended upon whether (1) he secured the $9 down payment; (2) he obtained the customer's home telephone number; (3) the customer was not self-employed; and (4) the customer had been employed for at least 1-½ years. In most cases the commission averaged $16.50. The crew leader also worked on a commission basis and additionally received an over-ride commission of $5 on every approved order of a member of his crew.

The Attorney General offered uncontradicted expert evidence that in view of industry-wide practices the maximum retail price which should have been charged for the entire package was approximately $108-$110. In the witness's opinion, the price charged by defendant was about two and one-half times the retail maximum, and he said that it was exorbitant. The trial court found that the price was exorbitant but held that such exorbitance *per se* did not constitute a fraud under *N. J. S. A.* 56:8–2. In its view, proof of deceptive practices was required in addition to the excessive price before a consumer's contract could be vitiated under the statute.

In deciding whether defendant, contrary to the statute, used any deception, fraud, false pretense, or misrepresentation, or whether he concealed, suppressed or omitted any material fact in connection with the sales to book purchasers, the price charged the consumer is only one element to be considered. If the price is grossly excessive in relation to the seller's costs, and if in addition the goods sold have little or no value to the consumer for the purpose for which he was persuaded to buy them and which the seller pretended they would serve, the price paid by the consumer takes on even more serious characteristics of imposition. Here the Attorney General offered persuasive evidence that the books had little or no educational value for the children in the age group and socio-economic position the defendant represented would be benefited by them.

The testimony showed that as to the New Achievement Library, three of the five volumes dealing with Nature, Science and Civilization, represented "very poor, watered-down articles which cover the * * * areas very superficially." They were of "extremely little use" or value as a means of raising the educational level of the children they were supposed to help. Another volume entitled "Getting Acquainted with Your Opportunities in Education" was extremely poor both in quality and content. Although the volume required a tenth grade reading level, it contained articles which the witness characterized as obsolete at the time it was being sold and irrelevant to 98% of its intended readers. "Child Horizons," consisting of four volumes and designed for children 6 to 10 years of age, was said to have no relevance to children whose unfortunate socio-economic conditions did not make them susceptible to the concepts and ideas reflected therein. It was, according to the expert, like giving calculus to a person who had never studied simple algebra. As to "High School Self Taught," the four volumes were useless not merely for members of a minority group but for basic education for any individual. They might have some value for refreshment purposes for a person who has been through high school,

"but for one to self teach, it is just impossible." Similar comments were made about other books in the package. Taken as a whole, the witness said that, in his judgment, the books

\* \* \* will serve no purpose in improving the intellectual level of these children, arousing their intellectual curiosity and compensating for the deficient intellectual climate in which they are being raised.

Defendant offered no contradictory proof on this subject.

The Attorney General produced 24 consumers who testified concerning their own experiences with defendant's sales personnel which led to the execution of the printed form purchase contracts. In no case was there any real explanation of the obligation being assumed upon signing the contract. Many buyers, relying on the representations of defendant's agents, did not read the form being signed. Even if they had read it, it is implicit in the trial court's finding that either they were incapable of comprehending its real import or they believed that, whatever it said, the real bargain they were making was the one outlined to them by defendant's sales representatives. These 24 consumers also described defendant's contract enforcement and collection practices. In each case the trial court found that

[t]he proofs abundantly support the finding that deceptive and fraudulent practices prohibited by *N. J. S. A.* 56:8–2 have been per-petrated by the defendant's sales representatives upon each of the 24 customers who testified. 110 *N. J. Super.* at 478.

As already noted, defendant does not dispute that finding on this appeal.

For purposes of this opinion it is sufficient to set forth generally the nature of the misrepresentations and deceptions practiced by defendant's solicitors:

1. Statements that defendant's employee was selling books under a special federal grant;

2. Statements that the books were being sold for "Head Start," for a school, for the Newark Board of Education, for

the school system, for a high school, or for a named school which did not exist;

3. Statements that the total contract price was $49.50, payable by the accumulation of 10¢ per day to meet the monthly payments, that the price was $115, $160, $199 or "pennies a day," $25, $75, 48¢ per week, etc., or that the package was free for experimental or demonstration purposes;

4. Statements that the contract was cancellable at the option of the consumer (where the consumer wanted to review the contract with her husband) followed by institution of suit to collect upon the contract;

5. Statements that the contract was not effective until receipt of the deposit, followed by litigation on the contract to collect even though no deposit was ever paid;

6. Institution of suit to collect against a non-signatory spouse following misrepresentative statements;

7. Statements that purchase of the package would lead to a high school equivalency diploma.

The record reveals that defendant brought suit against at least 19 of the 24 persons who testified in this case with the following results:

| | |
|---|---:|
| Default judgments | 8 or 9 |
| Garnishment | 3 |
| Garnishment against non-signing spouse | 5 |
| Case dismissed; these occurred when defendant's attorneys refused to file answers to interrogatories or failed to appear at the trial | 4 |
| Case settled | 8 |

In one of these cases a young wife under 21 years of age with two infant children had been induced to sign a contract by a false price. Her husband, also under 21 years of age, had not signed the contract but his wages were garnished and he lost his position.

Defendant instituted 779 collection actions in New Jersey on these contracts between 1964 and 1968; 628 of these re-

sulted in judgments for the plaintiff, with no representative of Educational Services Company even appearing to testify. According to the only figures available there were 174 garnishment proceedings out of the last 183 suits. The trial court found that defendant had brought suit to enforce 70% of his New Jersey contracts.

In a comprehensive opinion, the trial court resolved all factual issues in favor of the Attorney General. Its consequent judgment

(1) enjoined defendant from continuing or engaging in any fraud or deception as defined in *N. J. S. A.* 56:8–2 and particularly from engaging in any of the deceptive practices or misrepresentations hereinabove outlined;

(2) ordered that defendant enter cancellations of all judgments arising out of the sales contracts involved in the case which were docketed against any of the consumers or their spouses who testified at this trial;

(3) ordered defendant to restore to the testifying customers all moneys they paid him pursuant to default judgments entered against them; upon receiving payment, such persons were directed to return to defendant whatever books and materials they had received under the contracts which they still had in their possession; it was provided also that their inability to make complete return of the books, etc. would not bar their right to recovery of the sums they paid under the default judgments;

(4) enjoined defendant from instituting any action seeking a money recovery under the sales contract against any of the 24 consumers who had testified in the case;

(5) recited that since the 24 contracts involved in the action were obtained through practices violative of *N. J. S. A.* 56:8–2, a penalty of $100 in each instance or $2400 would be imposed upon defendant under *N. J. S. A.* 56:8–13.

However, the trial court declined certain additional relief sought, hence this appeal. More particularly, although it was declared that all of the 24 contracts discussed in the proofs were procured in violation of the statute, restoration

of moneys paid by some victims through their attorneys in settlement of defendant's claims against them was denied.[2] But more important, it was held that although the contract price for the "educational package" was exorbitant it did not constitute a fraud *per se* under the statute. Further, and of crucial importance to the Attorney General's position as representative of the public and of the Office of Consumer Protection, *N. J. S. A.* 52:17B–5.6, 5.7, the court held that the unconscionability of a contract or clause thereof within the meaning of the Uniform Commercial Code, *N. J. S. A.* 12A:2–302, and the remedy provided therefor by that section, are matters of private concern and cannot be asserted by the Attorney General under the consumer fraud statute here involved, *N. J. S. A.* 56:8–8. See *N. J. S. A.* 52:17A–4(h), 52:17B–5.7. Therefore it declared that the unconscionability section of the Code was neither relevant nor available to the Attorney General in the action either as it related to the 24 named consumers or to other consumers similarly situated for whom relief was sought. That view resulted in the rejection of the Attorney General's contention that the contract, being unconscionable within Section 2–302 of the Code, was also violative of Section 2 of the Consumer Fraud Act, and therefore for that reason alone should be adjudged illegal, not only in the 24 specific cases covered by the proof, but also in behalf of all others similarly situated, *i. e.*, those consumers who had executed the same contract for the same so-called educational package at the same price. We find ourselves in agreement with the Attorney General's contention that his claims for broader affirmative relief should be recognized. Denial of such relief would be unfortunate not only in this case, but it would operate as a serious impairment to the deterrent effect of the sanctions which we believe underlies the Consumer Fraud Act.

---

[2] No appeal was taken from this portion of the judgment. Consequently we express no opinion as to its legal propriety.

# I

In resolving the problems presented, first attention must be given to the authority and status of the Attorney General to institute an action in consumer fraud cases seeking affirmative relief not only for the benefit of specifically named consumers but also for a large number of unnamed consumers similarly situated who wish to be represented and to benefit by the judgment entered therein. Obviously a just resolution can be reached only through a sensitive awareness of the climate of our time as it has been influenced by legislative and judicial measures affecting the buyer-seller relationship in the marketing of consumer goods. There can be no doubt that, in today's society, sale of consumer goods, especially on an installment credit basis, has become a matter of ever-increasing state and national anxiety. In recent years New Jersey lawmakers have become deeply concerned with suppression of commercial deception in consumer transactions. See *General Investment Corp. v. Angelini*, 58 *N. J.* 396 (1971); *Unico v. Owen*, 50 *N. J.* 101 (1967); *Henningsen v. Bloomfield Motors, Inc.*, 32 *N. J.* 358, 388–391 (1960). The Consumer Fraud Act invoked here, *N. J. S. A.* 56:8–1 *et seq.*, is only one example of the concern. To it may be added the Retail Installment Sales Act, *N. J. S. A.* 17:16C–1 *et seq.*, and the Home Repair Financing Act, *N. J. S. A.* 17:16C–62 *et seq.* See *General Investment Corp. v. Angelini, supra.*

The courts, recognizing the current trends in consumer protection legislation, have realized that with such measures, as well as with utilization of the common law concepts of fraud and unconscionability, they can assume an active role in strengthening the consumer's limited market leverage. As this Court said in *Ellsworth Dobbs, Inc. v. Johnson*, 50 *N. J.* 528 (1967):

> Courts and legislatures have grown increasingly sensitive to imposition, conscious or otherwise, on members of the public by persons with whom they deal, who through experience, specialization,

licensure, economic strength or position, or membership in associations created for their mutual benefit and education, have acquired such expertise or monopolistic or practical control in the business transactions involved as to give them an undue advantage. 50 *N. J.* at 553.

Contemporary judicial sentiments of which we approve were expressed recently by the New York Supreme Court in this fashion:

The law is beginning to fight back against those who once took advantage of the poor and illiterate without risk of either exposure or interference. From the common law doctrine of intrinsic fraud we have, over the years, developed common and statutory law which tells not only the buyer but also the seller to beware. This body of laws recognizes the importance of a free enterprise system but at the same time will provide the legal armor to protect and safeguard the prospective victim from the harshness of an unconscionable contract. *Jones v. Star Credit Corp.*, 59 Misc. 2d 189, 298 *N. Y. S.* 2d 264, 266 (Sup. Ct. 1969).

See also *State by Lefkowitz v. ITM, Inc.*, 52 *Misc.* 2d 39, 275 *N. Y. S.* 2d 303, 321–322 (Sup. Ct. 1966).

The existing statutes in our State, and particularly *N. J. S. A.* 56:8–1 *et seq.* and 12A:2–302, reveal that the Legislature did not limit its consideration or treatment of the need for consumer protection to the creation of private remedies between the individual buyer and seller. Obviously it recognized that the deception, misrepresentation and unconscionable practices engaged in by professional sellers seeking mass distribution of many types of consumer goods frequently produce an adverse effect on large segments of disadvantaged and poorly educated people, who are wholly devoid of expertise and least able to understand or to cope with the "sales oriented," "extroverted" and unethical solicitors bent on capitalizing upon their weakness, and who therefore most need protection against predatory practices. As we see the statutes cited, as well as the act establishing the Office of Consumer Protection, *N. J. S. A.* 52:17B–5.6, it seems plain that the lawmakers accepted the premise that the market bargaining process does not protect ordinary

consumers from serious damage in a large number of transactions. Obviously, giving the consumer rights and remedies which he must assert individually in the courts would provide little therapy for the overall public aspect of the problem. It has been said that "[o]ne cannot think of a more expensive and frustrating course than to seek to regulate goods or 'contract' quality through repeated lawsuits against inventive 'wrongdoers.'" Leff, "Unconscionability and the Crowd — Consumers and The Common Law Tradition," 31 *U. Pitt. L. Rev.* 349, 356 (1970). As Professor Leff suggests, mass consumer transactions growing out of unequal bargaining power and unfair practices should not be handled on a case-by-case basis. The emphasis must be upon public rather than private remedies, and the natural remedial step is government intervention. *Id.* 351.

Accepting the need for a public as well as a private remedy, the Legislature, by *N. J. S. A.* 56:8–8, clearly empowered the Attorney General to police consumer practices and contracts. Section 8 authorized him to obtain an injunction against a seller who in marketing his products uses deception, fraud, false pretense, misrepresentation or concealment of material facts in violation of *N. J. S. A.* 56:8–2. And this remedy is available even though no consumer has in fact been misled or damaged thereby. But more important for purposes of the present case, in such an injunction action, as the cited section says, the court "may make such orders or judgments as may be necessary to prevent the use or employment by a person of any prohibited practices, or which may be necessary to restore to any person in interest any moneys or property, real or personal which may have been acquired by means of any practice herein declared to be unlawful." That the Legislature intended to confer on the Attorney General the broadest kind of power to act in the interest of the consumer public is indicated not only by the quoted language but also by the act establishing the Office of Consumer Protection. Under the latter statute all of the functions, powers and duties of the Attorney General derived

from the Consumer Fraud Act as set out in *N. J. S. A.*
56:8–2 and 8 are directed to be exercised by him through
the Office of Consumer Protection. *N. J. S. A.* 52:17B–5.7.
That office in turn is ordered to advise the Attorney General "as to all matters affecting the interests of the public
as consumers," (*N. J. S. A.* 52:17B–5.9(b)) and to do
through the Attorney General "such other acts as may be
incidental to the exercise of the powers and functions" conferred upon it. *N. J. S. A.* 52:17B–5.9(i).

The purpose to be gleaned from the statute specifically
involved here, when read in light of the other pertinent
legislation adverted to, is that while private rights and interests were to be served, public interests of substantial consumer groups were likewise to be protected. It has been amply demonstrated that the strongest case for relief from form
contract oppression and deceptive and fraudulent misrepresentations is presented by the poor, the naive and the uneducated consumers who have yielded unwittingly to such
high pressure sales tactics. The Legislature has decreed
that they are a class of persons to whom the courts should
give special protection. Consequently there is a tremendous
need to find a simple, inexpensive solution which will accomplish the greatest possible good for the greatest possible
number of consumers who have common problems and complaints vis-a-vis the seller. If the only available route had
been pursuit of a private remedy by individual victims of
the unfair practices specified by *N. J. S. A.* 56:8–2, such a
rule would require an unrealistic expenditure of judicial
energy and would be inconsistent with current trends in
consumer protective legislation. Speidel, "Unconscionability,
Assent and Consumer Protection," 31 *U. Pitt. L. Rev.* 359,
364–65 (1970).

In our judgment the statutes referred to above in their
total impact, when considered in connection with the Attorney General's general statutory and common law authority
to act in matters affecting the public welfare (*N. J. S. A.*
52:17A–4(h) ; *O'Regan v. Schermerhorn,* 25 *N. J. Misc.* 1,

9, 50 *A*. 2d 10 (Sup. Ct. 1946), require the conclusion that he has authority to bring action in the public interest under *N. J. S. A.* 56:8–8 either on behalf of specifically named buyers who have been imposed upon contrary to Section 2 thereof, or in the nature of a class action on behalf of all similarly situated buyers. Although the procedural aspects of such a suit need not be passed upon at this time, guidance may be found in *R.* 4:32–1, 2 and 3 which relate generally to class actions.

Recently the Supreme Court of California in a forward looking opinion sustained a class action brought by a group of consumers on their own behalf and on behalf of others similarly situated. *Vasquez v. The Superior Court of San Joaquin County,* 4 *Cal.* 3d 800, 94 *Cal. Rptr.* 796, 484 *P.* 2d 964 (1971). The suit sought rescission of contracts for the purchase of frozen food and freezers, which were entered into through the fraudulent misrepresentations of the seller's agents. In approving the form of action the court commented:

Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society. According to the report of the Kerner Commission, many persons who reside in low income neighborhoods experience grievous exploitation by vendors using such devices as high pressure salesmanship, bait advertising, misrepresentation of prices, exorbitant prices and credit charges, and sale of shoddy merchandise. State laws governing relations between consumers and merchants are generally utilized only by informed, sophisticated parties, affording little practical protection to low income families. * * * The alternatives of multiple litigation * * * do not sufficiently protect the consumer's rights because these "devices" presuppose "a group of economically powerful parties who are obviously able and willing to take care of their own interests individually through individual suits or individual decisions about joinder or intervention."

 * * * * * * * *

Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all. Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller re-

tains the benefits of its wrongful conduct. A class action by consumers produces several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition and avoidance to the judicial process of the burden of multiple litigation involving identical claims. The benefit to the parties and the courts would, in many circumstances, be substantial. 94 *Cal. Rptr.* 800–801, 484 *P.* 2d at 968–969.

The court rejected the contention that a class action could not be maintained because each consumer made a separate contract at a different time and under different circumstances than the others. It declared that if plaintiffs could prove their allegations that the salesmen employed substantially identical misrepresentations, sufficient commonality of interest and problem would appear to justify the class suit. See Travers and Landers, "The Consumer Class Action," 18 *U. Kan. L. Rev.* 811 (1970) ; Eckhardt, "Consumer Class Actions," 45 *Notre Dame Lawyer* 663 (1970).

It may be noted that the Attorney General of California filed a brief *amicus curiae* in support of the class action device. He indicated, however, that the limited personnel of his office prevented him from pursuing such actions in his official capacity. But he did not suggest that as Attorney General he lacked authority to institute class actions of the type before the court.[3] See Dole, "Consumer Class Ac-

---

[3] While the case was pending the California Legislature enacted the Consumers Legal Remedies Act (Civ. Code § 1750, *et seq.*) which authorizes class actions by private consumers under certain conditions, *i. e.*:

(1) It is impracticable to bring all members of the class before the court.

(2) The questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members.

(3) The claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class.

(4) The representative plaintiffs will fairly and adequately protect the interests of the class. § 1781(b).

Our class action rule, *R.* 4:32–1, is substantially the same. *Cf. Crescent Park Tenants Ass'n v. Realty Equities Corp.*, 58 *N. J.* 98 (1971).

tions Under Recent Consumer Credit Legislation," 44 *N. Y. U. L. Rev.* 80 (1969); *Speidel, supra,* 31 *U. Pitt. L. Rev.* at 365; and see *Larson v. State, ex rel. Patterson,* 266 *Ala.* 589, 97 *So.* 2d 776 (1957) where the court made plain that the Attorney General could seek an injunction and a collection bar against a finance company which was charging usurious interest rates on short term small loans to necessitous borrowers. It was said that such conduct, *i. e.,* the continuous and intentional charging of such interest, in taking advantage of financially distressed people caused injury to the public welfare, and was enjoinable as a public nuisance. See *Nash v. State,* 271 *Ala.* 173, 123 *So.* 2d 24 (1960); *Annotation,* "Practice of exacting usury as a nuisance or ground for injunction," 83 *A. L. R.* 2d 848 (1962); and *cf. State v. Martin,* 77 *N. J. L.* 652 (E. & A. 1909); *State v. Diamant,* 73 *N. J. L.* 131 (Sup. Ct. 1905); Comment, "Commercial Nuisance: A Theory of Consumer Protection," 33 *U. Chi. L. Rev.* 590 (1966).

## II

Since we are satisfied that the public welfare would be sufficiently adversely affected by a consumer goods seller's engagement in practices condemned by *N. J. S. A.* 56:8–2 to justify a remedial action by the Attorney General in behalf of consumers who constitute an ascertainable class of victims with a sufficient community of interest, we turn to his right to the specific relief denied below. Quite obviously the Attorney General recognized that a class action is not maintainable if the right of each individual claimant to relief depended upon a separate set of facts applicable only to him. Although the proof adduced at the hearing showed that defendant's agents practiced certain patterns of sales conduct, each of which deceived and misled a group of consumers, no effort was made to obtain separate adjudication of illegality of the contracts of each group of the 24 persons who participated in the trial or the contracts of all others

similarly situated who were victimized by the same pattern of conduct. And no such issue is before us.

The Attorney General's claim was that there was one illegal aspect of the sales contract which was common to every transaction, namely the fixed price. This price for the package of books and materials, which the testimony showed was about two and a half times a reasonable price in the relevant market, was found by the trial court to be exorbitant. As we have already noted, the Attorney General pointed out that in addition to being excessive in relation to defendant's cost, the books had very little and in some cases no value for the purpose for which the consumers were persuaded to buy them. Consequently he urged that under the circumstances the price was unconscionable under Section 2–302 of the Uniform Commercial Code and, as such, was within the proscription of Section 2 of the Consumer Fraud Act. More particularly, he contends that on the uncontradicted and common facts of each transaction, the unconscionable price must be equated with the deception, fraud, false pretense, misrepresentation or knowing material omission condemned by Section 2. If the contention is sound, then it should follow that every consumer who executed the form agreement for the educational package described above at the price fixed by defendant ought to be considered similarly situated, and the Attorney General would therefore be entitled to a judgment invalidating the contract for the entire class of such consumers.

As already noted, however, the trial court declined to hold that the price *per se* constituted a violation of Section 2 in the absence of some concomitant deceptive practice perpetrated by the seller. The opinion pointed out that the word "unconscionable" did not appear in Section 2 and consequently should not be considered as included therein. 110 *N. J. Super.* at 482. Further the court declared that even though enforcement of an unconscionable contract may be denied under Section 2–302 of the Code, the remedy provided thereby is "strictly a matter of private concern" and

cannot be asserted or relied upon by the Attorney General in a suit allegedly brought for protection of the consuming public. 110 *N. J. Super.* at 481.

Unconscionabilty is not defined in Section 2–302 of the Uniform Commercial Code, and we agree that it is not mentioned by name in Section 2 of the Consumer Fraud Act. It is an amorphous concept obviously designed to establish a broad business ethic. The framers of the Code naturally expected the courts to interpret it liberally so as to effectuate the public purpose, and to pour content into it on a case-by-case basis.[4] In that way a substantial measure of predictability will be achieved and professional sellers of

---

[4] This approach to the definition of "unconscionability" parallels that employed in developing the definition of fraud. Thus, one commentator has observed:

The Courts have always avoided hampering themselves by defining or laying down as a general proposition what shall be held to constitute fraud. Fraud is infinite in variety. The fertility of man's invention in devising new schemes of fraud is so great, that the Courts have always declined to define it, or to define undue influence, which is one of its many varieties, reserving to themselves the liberty to deal with it under whatever form it may present itself. Fraud, in the contemplation of a Civil Court of Justice, may be said to include properly all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed, and are injurious to another, or by which an undue or unconscientious advantage is taken of another. All surprise, trick, cunning, dissembling and other unfair way that is used to cheat any one is considered as fraud. *Kerr, Fraud and Mistake*, 1 (7th ed. (1952)).

See also 37 *Am. Jur.* 2d, *Fraud and Deceit* § 1, pp. 17–20 (1968); *Riverside Trust Co. v. Collin*, 114 *N. J. Eq.* 157 (E. & A. 1933); *Hume v. United States*, 132 *U. S.* 406, 10 *S. Ct.* 134, 33 *L. Ed.* 393 (1889).

For an excellent discussion of the significance of "unconscionability" see the article by Professor John E. Murray, Jr. "Unconscionability: Unconscionability," 31 *U. Pitt. L. Rev.* 1 (1969), and the trilogy of comments thereon, "The Unconscionable Contract or Term," 31 *U. Pitt. L. Rev.* 337 (1970) by Professor Braucher; "Unconscionability and the Crowd, Consumers and the Common Law Tradition," 31 *U. Pitt. L. Rev.* 349 (1970) by Professor Leff, and "Unconscionability, Assent and Consumer Protection," 31 *U. Pitt. L. Rev.* 359 (1970) by Professor Speidel, and see also Professor Spanogle's article "Analyzing Unconscionability Problems," 117 *U. Pa. L. Rev.* 931 (1969).

consumer goods as well as draftsmen of contracts for their sale to ordinary consumers will become aware of the abuses the courts have declared unacceptable and will avoid them. The intent of the clause is not to erase the doctrine of freedom of contract, but to make realistic the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion. Viewed in that sense, freedom to contract survives, but marketers of consumer goods are brought to an awareness that the restraint of unconscionability is always hovering over their operations and that courts will employ it to balance the interests of the consumer public and those of the sellers.

The standard of conduct contemplated by the unconscionability clause is good faith, honesty in fact and observance of fair dealing. The need for application of the standard is most acute when the professional seller is seeking the trade of those most subject to exploitation—the uneducated, the inexperienced and the people of low incomes. In such a context, a material departure from the standard puts a badge of fraud on the transaction and here the concept of fraud and unconscionability are interchangeable. Thus we believe that in consumer goods transactions such as those involved in this case, unconscionability must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like, which are stamped unlawful under *N. J. S. A.* 56:8–2. We do not consider that absence of the word "unconscionable" from the statute detracts in any substantial degree from the force of this conclusion. That view is aided and strengthened by the plain inference that the Legislature intended to broaden the scope of responsibility for unfair business practices by stating in Section 2 that the use of any of the described practices is unlawful "whether or not any person [the consumer] has in fact been misled, deceived or damaged thereby."

We have no doubt that an exorbitant price ostensibly agreed to by a purchaser of the type involved in this case — but

in reality unilaterally fixed by the seller and not open to negotiation — constitutes an unconscionable bargain from which such a purchaser should be relieved under Section 2. If, therefore, in this case the price charged for the educational package is so exorbitant as to be unconscionable, Section 2 makes it unnecessary to decide whether the Attorney General could maintain a class action for all similarly affected consumers based solely upon violation of Section 2–302, the unconscionability clause of the Uniform Commercial Code. Adequate and proper relief for all consumers victimized by an unconscionable price may be obtained by the Attorney General through Section 2 of the Consumer Fraud Act under which his action was brought here.

 Sale at an exorbitant price especially in the market described by the evidence in this case raises a strong inference of imposition. Here the facts reveal that the seller's price was not only roughly two and one half times a reasonable market price, assuming functional adequacy of the book package for the represented purpose, but they indicate also that most of the package was actually practically worthless for that purpose. Such price-value clearly constitutes unconscionability and renders Section 2 available to the Attorney General in a class-type remedial action for the benefit of all similarly situated consumers. The statement to the Consumer Fraud Act, *N. J. S. A.* 56:8–1 *et seq.,* supports this view. It said:

The purpose of this bill is to permit the Attorney General to combat the increasingly widespread practice of defrauding the consumer. The authority conferred will provide effective machinery to investigate and prohibit deceptive and fraudulent advertising and selling practices which have caused extensive damage to the public.

In other jurisdictions exorbitant prices for consumer goods sold in a marketing milieu similar to our case have been declared unconscionable. In *State by Lefkowitz v. ITM, Inc., supra,* 275 *N. Y. S.* 2d 303, the seller marketed broilers, vacuum cleaners and color television sets using various types of deceptive sales practices. Among other things it appeared

that the sales prices to the consumers for the various items ranged from two to six times the costs to the seller. The proof showed also that defendant represented that the goods were not obtainable elsewhere at its prices. But they were available and at much lower prices. The court said it was clear that "these excessively high prices constituted 'unconscionable contractual provisions'[5] within the meaning of section 63, subsection 12 of the Executive Law," *N. Y. Executive Law* § 63 (12) ( *McKinney,* 1970-71 Supp.), and further that even if the prices were not unconscionable *per se,* "they were unconscionable within the context of this case" under Section 2–302 of the Uniform Commercial Code.

In *Jones v. Star Credit Corp., supra,* 298 *N. Y. S.* 2d 264, defendant sold a home freezer unit for $900 ($1439.69 with credit charges and sales tax) to plaintiffs who were welfare recipients at the time. The actual retail value was $300. The sale was held unconscionable as a matter of law under Section 2–302 of the Uniform Commercial Code.

The New Hampshire Supreme Court in *American Home Improvement, Inc. v. MacIver,* 105 *N. H.* 435, 201 *A.* 2d 886 (1964) had for decision a home improvement contract where the materials to be furnished and the services to be rendered were valued at $959. The home owner agreed to pay $2568.60 therefor, the price including service charges and commissions. It was held that "the contract should not be enforced because of its unconscionable features." 201 *A.* 2d at 889. In so holding the court referred to *U. C. C.* 2–302(1) and to the New Hampshire counterpart, *R. S. A.* 382–A:2–302(1). See also *Williams v. Walker-Thomas Furniture Company,* 121 *U. S. App. D. C.* 315, 350 *F.* 2d 445

---

[5]The New York Executive Law specifically includes "unconscionable contractual provisions" among the fraudulent practices condemned. As already indicated with respect to the New Jersey Consumer Fraud Act, if that language were not present in the New York law it would nonetheless be covered by the condemnation of "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or * * *." *N. Y. Executive Law* § 63 (12) (*McKinney, 1970–71 Supp.*)

(D. C. Cir. 1965); *Central Budget Corp. v. Sanchez*, 53 *Misc.* 2d 620, 279 *N. Y. S.* 2d 391 (Civil Ct. N. Y. 1967); and *cf. Osage Nation of Indians v. United States*, 97 *F. Supp.* 381, 119 *Ct. Cl.* 592 (U. S. Ct. Cl.), *cert. den.* 342 *U. S.* 896, 72 *S. Ct.* 230, 96 *L. Ed.* 672 (1951).

Two of our trial courts have declared that price unconscionability rendered a sales contract unenforceable. In *Toker v. Perl*, 103 *N. J. Super.* 500 (Law Div. 1968), the price of a freezer to the buyer was more than two and one half times its maximum value. The Appellate Division affirmed the judgment but on other grounds. 108 *N. J. Super.* 129 (App. Div. 1970). In *Toker v. Westerman*, 113 *N. J. Super.* 452 (Dist. Ct. 1970) involving the sale of a refrigerator-freezer, the price of two and one half times the reasonable retail value was found to be "shocking, and therefore unconscionable" (113 *N. J. Super.* at 454) within the contemplation of the Uniform Commercial Code § 2–302.

As set forth above, we are satisfied that the price for the book package was unconscionable in relation to defendant's cost and the value to the consumers and was therefore a fraud within the contemplation of *N. J. S. A.* 56:8–2. Further, for the reasons stated we are convinced that a view that such price unconscionability gives rise only to a private remedy is an unreasonable limitation on the aim and scope of the Consumer Fraud Act, *N. J. S. A.* 56:8–1 *et seq.* The public purpose to be served thereby (and we see the legislative emphasis as being more on public than on private remedies) can be accomplished effectively only by recognizing the authority of the Attorney General to intervene in behalf of all consumers similarly affected by the broadly described fraudulent sales tactics of merchandise sellers.

More specifically here, since the price unconscionability rendered the sales contract invalid as to all consumers who executed it, the Attorney General was entitled to a judgment so holding as to the entire class of such persons. Accordingly, the trial court's order must be modified to the end that such a judgment may be entered. The mechanics of effectuating

the judgment with respect to the individuals comprising the class and of accomplishing the necessary restorative relief required by *N. J. S. A.* 56 :8–8 are left to the trial court.

As modified the judgment is affirmed and the cause is remanded for further proceedings consistent with this opinion.

*For affirmance as modified*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For reversal*—None.