JOURNAL ENTRY and OPINION.
{¶ 1} Defendant-appellant Pepper Pike Properties, Inc. ("PPP") appeals the judgment of the Shaker Heights Municipal Court awarding plaintiff-appellee Republic Waste Services of Ohio Hauling L.L.C. ("Republic") $7,238.61 on Republic's complaint for breach of contract. Finding no error in the proceeding below, we affirm.
 {¶ 2} PPP owns and operates an office complex on Chagrin Boulevard. Prior to 1998, PPP had a contract with Waste Management for the removal of PPP's trash. The contract was terminable at will. In 1998, Republic assumed this contract as part of a court-ordered divestiture.
 {¶ 3} In March 1999, after operating under Waste Management's terms for a few months, Republic sent PPP a letter containing a customer survey and a written three-year renewable Service Agreement (the "Service Agreement"). Republic mailed the customer survey and Service Agreement to PPP's primary office, but did not direct them to any particular individual.
 {¶ 4} Upon receipt of the customer survey and Service Agreement, PPP's employee responsible for disbursing mail distributed the Service Agreement to Roy Pekoc ("Pekoc"), PPP's maintenance supervisor. Pekoc signed the Service Agreement in the location requesting "AUTHORIZED SIGNATURE," and listed his "TITLE" as "Maintenance." Immediately above the request for an "AUTHORIZED SIGNATURE," the Service Agreement contained the following disclosure in capital letters and boldface type:
 {¶ 5} "This is a legally binding contract and company agrees to provide, and customer agrees to accept the services and equipment at the charges and frequency indicated on this agreement subject to the terms and conditions specified on the reverse side."
 {¶ 6} Under the terms of the Service Agreement, PPP agreed to pay Republic $577 per month ("monthly service charge") in consideration for Republic's supplying a container for PPP's trash and removing the trash. Pursuant to the terms of the Service Agreement, the monthly service charge was periodically increased. In June 2000, disappointed with continual price increases, PPP terminated Republic's services.
 {¶ 7} Although PPP used Republic's waste hauling services for 15 months after the Service Agreement was signed and regularly paid monthly charges including periodic increases, PPP claims it was unaware of the existence of the Service Agreement until it terminated Republic's services. PPP claims it was then that Republic notified PPP that its maintenance man, Roy Pekoc, had signed and returned the Service Agreement on March 30, 1999.
 {¶ 8} At the time PPP terminated the Service Agreement, there were 21 months left on the three-year agreement. In the event of a breach, the Service Agreement provided for liquidated damages calculated as follows:
 {¶ 9} "a) if the remaining term hereunder is six months or more, Customer shall pay the monthly service fee for the immediately preceding calendar month multiplied by 6; or b) if the remaining term hereunder is less than six months, Customer shall pay the monthly service fee for the immediately preceding calendar month multiplied by the number of months remaining in the term."
 {¶ 10} After PPP terminated the Service Agreement in June 2000, Republic left its trash receptacle on PPP's property for ten months while trying to resolve the dispute. The container occupied two parking spaces in PPP's parking lot. PPP charges $60 per month to rent a parking space.
 {¶ 11} In April 2001, Republic filed a complaint in the Shaker Heights Municipal Court seeking damages for wrongful and premature termination of the written, three-year Service Agreement. Republic sought damages for past due service charges, liquidated damages, interest, finance charges, and attorney's fees. PPP filed a counterclaim for Republic's breach of an implied agreement to store its trash receptacle on PPP's property for ten months after termination of the trash removal agreement.
 {¶ 12} On April 23, 2002, after a one-day bench trial, the trial court awarded Republic all of its liquidated damages, interest, and attorney's fees in accordance with the calculation method set forth in the Service Agreement. The trial court also awarded PPP $1,200 on its original $10,000 counterclaim, for the reasonable rental value of two parking spaces in PPP's lot.
 {¶ 13} PPP raises two assignments of error on appeal. The first assignment of error states:
 {¶ 14} "The trial court erred by finding that Pepper Pike Properties' maintenance man had authority to bind Pepper Pike Properties to appellee's service agreement."
 {¶ 15} In its first assignment of error, PPP argues the trial court's finding that Pekoc had authority to sign the Service Agreement and bind PPP was "erroneous as a matter of law and an abuse of discretion." PPP contends there was no evidence at trial proving that Pekoc had authority to sign the Service Agreement. Thus, PPP argues the trial court's finding was contrary to law and against the manifest weight of the evidence.
 {¶ 16} In a bench trial, the trial judge, as the trier of fact, determines the credibility of witnesses, and the weight to be given the evidence. State v. Walker (1985), 26 Ohio App.3d 29, 32. A judgment is against the manifest weight of the evidence if it is "so manifestly contrary to the natural and reasonable inferences to be drawn from the evidence as to produce a result in complete violation of substantial justice." Sambunjak v. Bd. of Rev., Ohio Bur. of Empl. (1984),14 Ohio App.3d 432, 433; Royer v. Bd. of Edn. (1977), 51 Ohio App.2d 17,20. A judgment will not be reversed as being against the manifest weight of the evidence where some competent, credible evidence exists to support the judgment. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80.
 {¶ 17} PPP argues there was no evidence supporting a finding that Pekoc had actual, implied, or apparent authority to bind it. PPP also argues the trial court erroneously placed upon it the burden of proving Pekoc's authority or lack of authority. None of these arguments are supported by the record.
 {¶ 18} A principal is liable for the acts of his agent if the agent had authority to act for the principal. Such authority may be either actual or apparent. Actual authority may be expressed or implied.
 {¶ 19} "Express authority is that authority which is directly granted to or conferred upon the agent or employee in express terms by the principal, and it extends only to such powers as the principal gives the agent in direct terms; and the express provisions are controlling where the agency is expressly conferred * * *" Master Consolidated Corp.v. BancOhio Natl. Bank (1991), 61 Ohio St.3d 570.
 {¶ 20} An agent's implied authority may also arise from the principal's express delegation of actual authority. Unless its extent is expressly limited by the principal, implied authority is that authority which is incidental and necessary for the agent to carry into effect the powers expressly conferred upon him by the principal. Damon's Missouri,Inc. v. Davis (1992), 63 Ohio St.3d 605, 608 (citing Spengler v.Sonnenberg (1913), 88 Ohio St. 192, 200-201). An agent acting within the scope of his actual authority, expressly or impliedly conferred, has the power to bind the principal. Saunders v. Allstate Ins. Co. (1958),168 Ohio St. 55, 58-59.
 {¶ 21} Even if no actual authority has been given, the principal may be held liable if the principal appeared to give authority to the agent. A principal may be liable to a third party for the acts of the principal's agent, even though the agent had no actual authority, if the principal has by his words or conduct caused the third party to reasonably believe that the agent had the requisite authority to bind the principal. Miller v. Wick Bldg. Co. (1950), 154 Ohio St. 93, 95-96.
 {¶ 22} In the instant case, Pekoc was the head of PPP's maintenance staff. Glenn Darling ("Darling"), the managing partner of PPP, testified that Kelly Pekoc was responsible for and authorized to determine which representatives are responsible for handling different aspects of PPP's business and routing mail dealing with those matters to the appropriate individuals. Darling admitted that Ms. Pekoc acted within the scope of this authority by delivering the Service Agreement and other materials to Roy Pekoc "for his review and completion."
 {¶ 23} Darling also admitted that PPP does not have any written policies, procedures, or manuals indicating which individual employees are authorized to execute contracts and that Pekoc was authorized to sign invoices and other agreements for the purchase of supplies, tools, or materials. Although Darling testified that he is the only individual authorized to sign contracts on behalf of PPP, he admitted that PPP has entered into agreements without his signature. Thus, there was competent credible evidence to support the trial court's finding that Pekoc had implied authority to execute the Service Agreement with Republic because such a task was incidental to his other maintenance duties and there were no express limitations or restrictions on his authority.
 {¶ 24} There was also evidence that Pekoc had apparent authority to bind PPP to the Service Agreement with Republic. Pekoc signed the Service Agreement in the location requesting an "AUTHORIZED SIGNATURE" and listed his "TITLE" as "Maintenance." Joseph Vossler ("Vossler"), Republic's sales manager, testified that there was nothing unusual about Pekoc's signature on the Service Agreement because, in his fifteen years of sales experience in the waste hauling industry, it was common for maintenance departments to execute service agreements.
 {¶ 25} Vossler also testified that Republic relied upon Pekoc's signature in providing waste hauling services under the terms and conditions of the Service Agreement. Darling testified that at the time Pekoc executed the Service Agreement, neither he nor any other PPP employee informed Republic of any limitations or restrictions on Pekoc's authority. Moreover, PPP used Republic's waste hauling services for 15 months after the Service Agreement was signed and regularly paid monthly charges including periodic increases without question. Under these circumstances, Republic would have reasonably believed that Pekoc had the requisite authority to bind PPP. Therefore, there was competent, credible evidence proving Pekoc had apparent authority to bind PPP to the Service Agreement with Republic.
 {¶ 26} Because the evidence demonstrating Pekoc's authority to bind PPP was substantial, PPP's argument that the trial court erroneously placed the burden on PPP to prove Pekoc did not have authority is without merit. Accordingly, PPP's first
 {¶ 27} assignment of error is overruled.
 {¶ 28} PPP's second assignment of error states:
 {¶ 29} "The trial court erred by holding the service agreement enforceable against Pepper Pike Properties."
 {¶ 30} In its second assignment of error, PPP argues the Service Agreement is unenforceable because the liquidated damages provision is a penalty and the contract is unconscionable.
 {¶ 31} Whether a stipulated amount in a damages clause constitutes liquidated damages or should be considered as a penalty is a question of law for the court to decide. Lake Ridge Academy v. Carney (1993),66 Ohio St.3d 376, 380. Therefore, we will apply a de novo standard of review when evaluating this issue. See Cleveland Elec. Illum. Co. v.Pub. Util. Comm. (1996), 76 Ohio St.3d 521, 523.
 {¶ 32} In Samson Sales, Inc. v. Honeywell, Inc. (1984),12 Ohio St.3d 27, syllabus, the Ohio Supreme Court set forth the following three-prong test to determine whether a liquidated damages provision should be upheld:
 {¶ 33} "Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof."
 {¶ 34} In Samson Sales, the Supreme Court also stated, "Whether a particular sum specified in a contract is intended as a penalty or as liquidated damages depends upon the operative facts and circumstances surrounding each particular case * * *." Id. at 28-29.
 {¶ 35} Applying this test to the facts of this case, we conclude the damages clause in the Service Agreement constitutes an enforceable liquidated damages provision.
 {¶ 36} First, according to Vossler's uncontroverted testimony, the damages Republic incurs as a result of a customer's failure to honor a three-year Service Agreement are difficult to ascertain and prove. Because Republic sells a service as opposed to a tangible commodity, it is difficult to determine the net loss Republic sustains from the loss of a customer. Unlike the breach of a lease where the loss can be easily calculated by the number of months an apartment was vacant before it could be leased again, Republic cannot replace a customer for the exact same services. Although Republic may obtain a new customer whose monthly service rate may be similar to the revenues lost from the breaching customer, Republic may have been able to provide services to that new customer even if the breaching customer had never breached.
 {¶ 37} In addition, the difficulty in ascertaining Republic's damages is further complicated by the fact that the profitability of each account is interrelated with the efficiency of services provided for the entire trash route. Vossler testified that it is not easy to determine when or whether Republic has replaced revenues from a terminated account and received the benefit of the bargain because the replacement account may be farther from the route, more difficult to access, or simply involve less revenue. Thus, Republic would be unable to calculate and prove the precise damages caused by the loss of PPP's account.
 {¶ 38} The second prong of the Samson Sales test focuses on whether the amount of the liquidated damages is unconscionable, unreasonable, or disproportionate in comparison to the "value of the subject contract" and the "probable consequences of the breach." Id. at 382. "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Id. at 383 (Citing Williams v. Walker-Thomas Furniture Co. (C.A.D.C. 1965), 350 F.2d 445, 449). A contract is unconscionable if it did not result "from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion." Id. (Citing Kugler v. Romain (1971), 58 N.J. 522, 544). The crucial question is whether "each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print * * * ?" Id.
 {¶ 39} The Service Agreement as a whole is not unconscionable. The Service Agreement is composed of two sides of a single page pre-printed form. "Pre-printed forms are a fact of commercial life and do not serve to demonstrate prima facie unconscionability." Harper v. J.D. Byrider ofCanton (2002), 148 Ohio App.3d 122, 124. Nearly all of the terms and conditions, except for basic service and billing information, are contained on the reverse side, in the same type size and font. The front of the Service Agreement contains two conspicuous notations, immediately above the signature block, that indicate the Agreement is subject to express terms and conditions that are contained on the reverse side.
 {¶ 40} PPP further argues that the Service Agreement is unconscionable because there is an absence of "meaningful choice" for the parties, considering their knowledge, experience, and ability to negotiate in a meaningful fashion. However, PPP is a sophisticated commercial entity in the business of leasing office and storage space. There is no evidence that lack of knowledge, education, or experience of either PPP as an entity, or Pekoc, individually, placed PPP at a disadvantage.
 {¶ 41} Moreover, the liquidated damages provision is proportionate in amount compared to the value of the services under the Agreement. PPP argues the liquidated damages clause is unconscionable, in part, because it does not require any sort of mitigation of damages. However, a valid liquidated damages clause contemplates the nonbreaching party's inability to identify and mitigate its damages. Lake Ridge Academy, supra at 385. The liquidated damages clause in the Service Agreement provides that if the remaining term of the Agreement is six or more months, damages are calculated by multiplying the most recent monthly service charge by six. Thus, the damages are capped. If the remaining term is less than six months, these damages are calculated by taking the most recent monthly service charge multiplied by the number of months remaining on the Agreement.
 {¶ 42} At the time PPP terminated the Service Agreement, there were 21 months remaining in the three-year contract. Under the liquidated damages provision, PPP is required to pay less than one-third of the anticipated revenues lost by Republic. Thus, the liquidated damages provision is not disproportionate. Moreover, in light of the service provided and the length of the contract term, there is no evidence that the liquidated damages of approximately $5,000 are unreasonable. Therefore, we find the Service Agreement is not unconscionable.
 {¶ 43} Finally, the terms of the liquidated damages clause evidence the parties' intention that the damages should be calculated according to the formula set forth in the Service Agreement in the event of the breach. Thus, the third prong of the Samson Sales test is met as well.
 {¶ 44} We, therefore, find the Service Agreement is not a penalty nor unconscionable. Accordingly, PPP's second assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Shaker Heights Municipal Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANNE L. KILBANE, P.J. and ANTHONY O. CALABRESE, JR., J. concur.