967 A.2d 845 (2009)
406 N.J. Super. 242
539 ABSECON BOULEVARD, L.L.C., a New Jersey Limited Liability Company, and Bhudev Sharma, Plaintiffs-Respondents/Cross-Appellants,
v.
SHAN ENTERPRISES LIMITED PARTNERSHIP, a New Jersey Limited Partnership; Suniti Corp., a New Jersey Corporation; Shan Realty Associates, L.P., a New Jersey Limited Partnership; Shan Realty Corp., a New Jersey Corporation; Sunil J. Shah; Nimesh Shah; Swati Shah; Jashvant Shah; and HJS Funding, L.L.C., a New Jersey Limited Liability Company, Defendants-Appellants/Cross-Respondents.
DOCKET NO. A-2250-06T1.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 2009.
Decided March 26, 2009.
*846 William J. Hughes, Jr., Atlantic City, argued the cause for appellants/cross-respondents (Cooper Levenson April Niedelman & Wagenheim, P.A., attorneys; Mr. Hughes, of counsel; Howard E. Drucks, on the brief).
Andrew J. Kyreakakis, Bloomfield, argued the cause for respondents/cross-appellants.
Before Judges R.B. COLEMAN, SABATINO and SIMONELLI.
The opinion of the court was delivered by
SABATINO, J.A.D.
After a non-jury trial, the Chancery Division ruled that defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -106 (the "CFA" or "the Act") in their sale to plaintiffs of a motel in Absecon and certain related land. The court awarded plaintiffs treble damages and counsel fees under the CFA, but rejected their separate common-law claims. The court also granted defendants' counterclaims against plaintiffs on certain promissory notes relating to the transaction.
Defendants appeal the adverse judgment under the CFA, and plaintiffs cross-appeal the court's ruling on the promissory notes. Both parties appeal the court's computation of damages.
We reverse the judgment in favor of plaintiffs because we conclude, as a matter of law, that the CFA does not apply to this sale of an ongoing business. We also sustain the dismissal of plaintiffs' common-law claims and reject their cross-appeal concerning the promissory notes.

I.
This litigation was brought in the Chancery Division by plaintiffs, 539 Absecon Boulevard, L.L.C. ("plaintiff" in the singular or "the LLC"), and Bhudev Sharma, against defendants Shan Enterprises Limited Partnership ("Shan Enterprises"), Suniti Corp., Shan Realty Associates, L.P. ("Shan Realty"), Shan Realty Corp. ("Shan *847 Corp."), Sunil J. Shah ("Sunil"), Nimesh Shah ("Nimesh"), Swati Shah ("Swati"), Jashvant Shah ("Jashvant"), and HJS Funding, L.L.C. ("HJS"). The complaint alleged common-law fraud, fraud in the inducement, fraudulent concealment, violation of the CFA, negligent misrepresentation, wrongful concert of action, conspiracy, breach of the implied covenant of good faith and fair dealing, unjust enrichment, unilateral mistake, and piercing of the corporate veil. The allegations arise out of the sale to plaintiffs in 2002 of an ongoing motel business and the real property where the motel was located.

Events Leading to the Purchase
Plaintiff Bhudev Sharma is a cardiologist. His sole business investment before 2002 consisted of a partnership share in a Kentucky Fried Chicken franchise. Through a patient, Sharma was introduced to a real estate broker, Babu Patel ("Patel"). In turn, Patel introduced Sharma to the Shah family. The family owned and operated the Comfort Inn located on Absecon Boulevard in Absecon ("the Inn"). The Inn is a seven-story building with 204 guest rooms.
Jashvant, a certified public accountant, was the patriarch of the Shah family. His son Sunil was also an accountant. Another son Nimesh lived and worked at the Inn and also worked as a bookkeeper in Sunil's office. The various family members, including Jashvant's wife, Hansa (who is not a named defendant), and Sunil's wife (defendant Swati), had ownership interests in several businesses throughout the years, both before and after 2002. These businesses included the Gloucester Inn; a Ramada Inn in Woodbridge; a Days Inn in Lancaster, Pennsylvania; a hotel in Dover, Delaware; and several Dunkin' Donuts stores.
Shan Enterprises, a limited partnership, operated the Inn. Suniti Corp. was the general partner of Shan Enterprises. Shan Realty was a limited partnership that owned the parcel of property adjacent to the Inn. Shan Corp. was the general partner of Shan Realty. Although the Shah family originally had other partners with them in the Inn, as of 1996, Hansa, Nimesh, and Swati owned 100% of Shan Enterprises. Hansa and Swati did not actively participate in operating the Inn.
In 2002 the Shah family decided to sell the Inn. Through Patel, they were introduced to Sharma as a prospective buyer. Jashvant and Sunil gave Sharma the Inn's profit and loss statements and tax returns for the years 1999, 2000, and 2001.
In considering the potential purchase, Sharma looked at the Inn's net income and profitability. The Inn's tax returns showed net income of $129,000 in 1999; $139,000 in 2000; and $236,000 in 2001. According to Sharma, he focused on the line on the tax return that reflected "ordinary income (loss) from trade or business activities." Sharma also looked at both the Inn's profit and loss statements and schedule of expenses for each of these three years. Having examined these documents, Sharma made the decision to buy the Inn.
Jashvant maintained that the combined asking price for the Inn, the property on which it was situated, and the adjacent parcel of land, was always $6 million; he contended that he never agreed to a lower figure. However, according to draft contracts dated May 29, 2002, prepared by defendants' attorney, the specified combined sales price for both parcels and the Inn was shown as $5,675,000. Another draft contract, dated June 26, 2002, showed a purchase price, solely for the Inn, of $5.4 million. In addition, Jashvant sent an e-mail to Patel on June 21, 2002, stating that a price adjustment had been made from $5.9 million to a lower amount.
*848 Jashvant claimed that he never reviewed these drafts before his attorney sent them out, that he never approved lower prices, and that the drafts did not constitute offers. Rather, he maintained that they were merely for discussion purposes only. Jashvant also contended that his June 21 e-mail to Patel was not true or complete. He insisted that plaintiffs had taken the e-mail out of context, although he could not say in what context he had written it.

The Sale Contracts and Other Related Documents
Two contracts of sale were executed on July 18, 2002. One was for the adjoining parcel (Block 225, Lot 8), and designated the seller as Shan Realty and the buyer as Sharma. It specified a purchase price for that lot of $275,000. The companion contract was for the Inn and the land at 539 Absecon Boulevard (Block 225, Lots 9 and 10) ("the Inn contract"), and designated the seller as Shan Enterprises and the buyer as Sharma. The purchase price for this portion of the transaction was $5,725,000, allocated as follows: $2,300,000 for the premises and improvements; $175,000 for personal property; and $3,250,000 for good will. Under these two contracts, the combined purchase price for the transaction was $6 million.
With respect to the Inn contract, Sharma paid a deposit of $100,000. The parties contemplated that at closing Sharma would pay an additional $5,050,000 by check and that he would also sign two notes, one for $250,000 and one for $325,000. Both notes were to be subordinate to a first mortgage on the property, in an amount not to exceed $3,900,000.
The "due diligence" section of the Inn contract referred to environmental and engineering due diligence. It also provided that the transfer of the Inn's franchise agreement was a condition of the sale.
Section 9.06 of the Inn contract, entitled "Buyer's Acknowledgments," provided as follows:
EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, BUYER ACKNOWLEDGES THAT BUYER HAS MADE OR HAS CAUSED TO BE MADE A THOROUGH PHYSICAL AND ENVIRONMENTAL EXAMINATION AND INSPECTION OF THE PROJECT AND IS NOW FAMILIAR WITH THE PHYSICAL AND ENVIRONMENTAL CONDITION THEREOF AND HAS INDEPENDENTLY INVESTIGATED, ANALYZED AND APPRAISED THE VALUE AND PROFITABILITY OF THE PROJECT. BUYER ACKNOWLEDGES AND AGREES THAT BUYER HAS ENTERED INTO THIS AGREEMENT WITHOUT ANY REPRESENTATIONS AND WARRANTIES HAVING BEEN MADE BY SELLER, ANY AGENT OR EMPLOYEE OF SELLER OR ANY BROKER, IF ANY, ACTING FOR SELLER OR ANY OTHER PERSON OR PERSONS, AS TO THE PRESENT OR FUTURE PHYSICAL OR ENVIRONMENTAL CONDITION OF THE PROJECT, THE STATUS OF TITLE, INCOME, LEASES, EXPENSES, OPERATION, SIZE, ZONING OR ANY OTHER MATTER OR THING WHOSOEVER [sic] AFFECTING OR RELATING TO THE PROJECT, EXCEPT TO THE EXTENT, IF ANY, SPECIFICALLY SET FORTH IN THIS AGREEMENT. EXCEPT AS MAY OTHERWISE BE EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER FURTHER AGREES TO ACCEPT THE PROJECT "AS IS, WHERE IS" IN THE CONDITION ON THE DATE OF THIS AGREEMENT, SUBJECT TO NORMAL WEAR AND TEAR AND DAMAGE *849 BY THE ELEMENTS FROM THE DATE HEREOF TO THE CLOSING DATE.
[(Emphasis added).]
In addition, the Inn contract contained a "Disclaimer" provision at Section 11.04, which provided as follows:
A. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER ACKNOWLEDGES THAT IT HAS EXAMINED THE PROJECT AND IS BUYING ALL OF THE PROJECT "AS IS, WHERE IS", WITHOUT WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF FITNESS OF THE PROJECT FOR A PARTICULAR USE, WHETHER BY SELLER, OR BY ANY AGENT, BROKER, EMPLOYEE OR OTHER REPRESENTATIVE OF SELLER, NOT EXPRESSLY STATED HEREIN. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT ALL UNDERSTANDINGS AND AGREEMENTS HERETOFORE AND BETWEEN THE PARTIES HERETO ARE MERGED IN THIS AGREEMENT, WHICH ALONE FULLY AND COMPLETELY EXPRESSES THEIR AGREEMENT.
B. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER ACKNOWLEDGES THAT BUYER HAS HAD AN ADEQUATE OPPORTUNITY TO INSPECT THE PROJECT AND TO MAKE SUCH LEGAL, FACTUAL AND OTHER INQUIRIES AND INVESTIGATIONS AS BUYER DEEMS NECESSARY, DESIRABLE OR APPROPRIATE WITH RESPECT TO THE PROJECT. WITHOUT ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIMS THAT IT HAS OR MAY HAVE AGAINST SELLER WITH RESPECT TO ANY CONDITION ON THE PROJECT, OR ANY OTHER STATE OF FACTS WHICH EXIST WITH RESPECT TO THE PROJECT. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THERE SHALL BE NO ADJUSTMENTS IN THE PURCHASE PRICE FOR ANY PHYSICAL, FUNCTIONAL, ECONOMIC OR ENVIRONMENTAL CONDITIONS.
[(Emphasis added).]
The Inn contract also contained a merger clause at Section 12.06. The clause specified that the agreement contained "all of the covenants, representations, warranties and agreements between the parties with respect to the subject matters contained herein," that "no other agreement, covenant, representation, inducement, promise or statement not set forth in writing in this Agreement and its Exhibits shall be binding on the parties," and that the agreement had been negotiated at arm's length. The merger clause further recited that both parties had received the advice of independent counsel and "ha[d] not relied upon the advice of any but its own accountants, counsel or advisors, concerning any aspect of the transactions contemplated by this Agreement including, without limitations, the tax implications thereof." (Emphasis added).
Additionally, Section 12.12 of the Inn contract, entitled "No Oral Change," provided in part:
No amendment, modification, termination, discharge or waiver of any provision of this Agreement will be effective *850 unless it is in writing and signed by the party intended to be bound thereby and then such amendment, modification, termination or waiver will be effective only in the specific instance and for the specific purpose for which given.

Plaintiffs' Consultant Frick's Pre-Sale Review of the Business
Sharma thought he could improve the marketing of the Inn by putting it under new management. Sharma hired Gas Lamp Management ("Gas Lamp"), a management company, for this purpose. He had discussions with Steven Frick, who was one of the principals of Gas Lamp.
Although Frick was not an accountant or a real estate appraiser, he had been in the hotel business since 1999, overseeing operations and handling bookkeeping. He visited the Inn in June 2002, at which time he was provided with the Inn's tax returns and profit and loss statements for the years 1999 through 2001.
Frick noticed that the Inn had consistent yearly income. He found it especially significant that the 2001 tax return showed $236,000 in net income. Although Frick knew that Sharma's operating costs would be higher, he was confident that he could increase revenue, primarily by improving marketing and increasing the room rate during high demand periods. Frick believed there was "quite a bit" of net income to work with.
Sharma testified that the due diligence was Frick's responsibility. According to Frick, the "due diligence" list that he provided to defendants included a request for documents, such as bank statements and accounts receivable, which he never received. Frick explained that he did not go back to defendants to request those documents because he "didn't hold their hand." Frick admitted that he was "pretty inexperienced at the time so [he] just did what [he] thought should be done."
In June 2002, Frick prepared a one-page "pro forma" accounting for the proposed transaction, based on an assumed purchase price of $6 million and a down payment of $1 million. This work-up was intended to be provided to the bank issuing the loan, so that the bank could see plaintiffs' expected income and expenses. Frick estimated a 15.6% rate of return on capital, based on net earnings before interest, depreciation, and amortization.
Based on defendants' reported gross revenues of almost $1.9 million, Frick applied a shorthand multiplier of three and determined that the purchase price should be around $6 million. In December 2002 Frick prepared a second pro forma calculation, this time based on a purchase price of $5.675 million and a down payment of $1.6 million.

The Integra Appraisal
Sharma applied to Madison Bank for his mortgage to finance this transaction. As part of its loan review, Madison Bank arranged for an appraisal. The appraisal report, completed by Integra Realty Resources ("Integra") on November 25, 2002, estimated the "going concern value" of the business and land to be only $4,900,000. This estimate was composed of the following: the real estate was valued at $3,685,000; the furniture, fixtures and equipment ("FFE") were valued at $715,000; the business and other intangibles were valued at $500,000; and the "excess land" (i.e., the adjoining parcel) was valued at $100,000. There was a deduction of $100,000 for the "keep fee," which was the buyer's cost of keeping the Comfort Inn franchise. Notably, Sharma was concurrently provided with a copy of the Integra appraisal.
In arriving at its $4.9 million valuation, Integra used two appraisal methodologies: *851 the sales comparison approach and the income capitalization approach. Using the sales comparison approach, Integra looked at four comparable sales and concluded that $24,000 per hotel room was an appropriate measure of value. Thus, 204 rooms in the Inn, multiplied by $24,000, yielded an appraised value of $4,896,000.
Under the alternative income capitalization approach, Integra considered the relationship between the property's potential income and its market value, expressed as a capitalization rate. The validity of this approach depended on the quality of the data available to estimate income, vacancy, and expenses. Integra applied only a direct capitalization analysis (as opposed to a discounted cash flow analysis) when using this methodology. Integra did so because it anticipated continued stability within the market, and also because it had been provided with an operating history for the Inn that indicated fairly stable revenues and expenses.
Through its income analysis, Integra first determined the potential gross income of the Inn by multiplying the number of rooms by the average daily room rate ("ADR") and the projected average annual occupancy. This calculation yielded estimated room revenue of $1,900,000 (rounded) (i.e., 365 days × 204 rooms × 35% occupancy rate × $70 ADR).[1] After deducting total operating expenses of $1,413,760, Integra computed net operating income at $508,240, which it rounded to $510,000. It then used a capitalization rate of 10.5% and came to a final appraised value of $4,857,142 (i.e., $510,000 divided by 10.5%), which it rounded to $4,900,000. Integra noted that the Inn's occupancy rate of 35% and its ADR of $70 showed that it was slightly underperforming when compared to its peer group.
Integra determined that the business value segment of the appraisal, which included intangibles, was based on three components: (1) the franchise affiliation; (2) management expertise; and (3) service. Integra allocated ten to eleven percent of its appraisal, or about $500,000, to such business value. It also allocated FFE at $715,000. The remainder was attributed to real estate, which included the land and improvements.
Accordingly, Integra allocated a $3,685,000 value to the Inn property. The parcel adjacent to the hotel, which was not severable as a stand-alone tract, was allocated a value of $100,000. This figure recognized the costs to prepare that parcel for development in conjunction with the hotel property.
As a result of Integra's total appraisal of $4.9 million, which was much less than the $6 million contract purchase price, the bank decided it would loan Sharma only $3.185 million. Sharma claimed that Sunil and Jashvant were willing to lower the sale price to $5.675 million. In addition, defendants were willing to take back a second mortgage on the property in the amount of $715,000. Nevertheless, Sharma was forced to look for other investors.
Shortly before closing, Sharma assigned the contract of sale to the LLC (539 Absecon Boulevard) that he had just formed. Based on investment contributions, Sharma owned 78% of the LLC, Thankar Narang (a neighbor of Sharma's) owned 11%, Frick owned 5.5%, and Dana Blasi (Frick's partner) owned 5.5%.[2]
Sharma was still willing to go ahead with the transaction with the Shahs even though the appraisal came in so low because *852 based on defendants' tax returns Sharma claimed "you're still seeing a tremendous return on investment." Based on the net income shown in those tax returns, Sharma expected that he could get a 15% return.

The Closing
On January 20, 2003, a "dry" closing took place, at which all of the transactional documents were signed but no funds were actually transferred until several days later. That same day, Sharma and Shan Enterprises signed an amendment to the contract of sale.[3] According to this amendment, Sharma was obligated to pay at closing the balance of the purchase price of $5,625,000 as follows: $4,910,000 by check and $715,000 by purchase money mortgage (i.e., the second mortgage). Shan Enterprises agreed to accept two promissory notes from Sharma, in the aggregate amount of $575,000, to reduce the amount of cash payable by Sharma at closing.
Four promissory notes were signed that day. Three of these notes, respectively in the amounts of $200,000, $250,000, and $325,000, named Sharma as the borrower and Shan Enterprises as the lender. On that same date, Shan Enterprises assigned to HJS its interests in the notes for $200,000 and $250,000. A fourth note, in the amount of $715,000, was secured by a second mortgage on the property and showed plaintiff (i.e., the LLC) as the borrower and HJS as the lender.
Also on January 20, 2003, a separate "letter agreement" was executed by Sharma, the LLC, and Shan Enterprises. According to this document, Shan Enterprises was "delivering to Sharma" its check in the amount of $200,000, "which Sharma is simultaneously returning to" Shan Enterprises. The document also provided that, in consideration of the execution by Sharma of the $200,000 promissory note, "the amount of funds which would otherwise be due and payable to" Shan from plaintiffs in connection with the sale of the Inn "shall be reduced by" $200,000.
According to the escrow agreement also executed that same day, four notes were delivered to the escrow agent: the three notes signed by Sharma in the amounts of $200,000, $250,000, and $325,000, and the note for the second mortgage in the amount of $715,000. The escrow agent also received a check from Shan Enterprises to Sharma for $200,000.
The parties stipulated to the wire transfers that were received on January 21, 2003, the day after the dry closing. These transfers were as follows: $100,000 from Frick; $100,000 from Blasi; $200,000 from Narang; $981,000 from Sharma; and another $169,000 from Sharma. The mortgage from Madison Bank was for $3,185,000. Final closing occurred a day later, on January 22, 2003.

The Parties' Diverging Views of the Transaction
The parties offered diverging accounts of what these various transactional documents signified. According to Sharma, it was his understanding that the notes for $200,000 and $325,000 were to be cancelled after the closing. He claimed that defendants had agreed that "if I was able to get more cash for the deal [from other investors] two notes would be cancelled." Since it was unknown until the last minute how much money Sharma actually would be able to raise, Sharma contended that "the closing statement was signed with those four notes, with the understanding that if I *853 was able to get the $400,000 those two notes would be cancelled."
Sharma claimed that the agreement to cancel two of the notes could be inferred from the amendment to the contract of sale and also from the side letter agreement concerning the $200,000 note. He recalled that Sunil had told him that when the additional investment money came in, the two notes would not be "operational."
To prove that he did not know until the last minute how much money he would be able to raise, Sharma pointed to an operating agreement for the LLC dated January 17, 2003. That document, which showed each investor's proposed percentages of ownership in the company, specified that these percentages "may be adjusted if the cash contributions actually contributed by the Members differ from these percentages."
There is a discrepancy between the amendment to the contract of sale, which stated that the two notes that were to be used to reduce the cash otherwise payable at closing totaled $575,000, and the two notes that Sharma claimed would be inoperative if he came up with additional cash totaled a lesser sum, i.e., $525,000. In an attempt to explain this discrepancy, Sharma maintained that the $325,000 note enabled the reduction in the sale price from $6 million to $5.675 million, and that the check he was supposed to get from defendants at closing for $200,000 would substitute for the $200,000 note. All that should have been left operative, according to Sharma, was the $250,000 note and the mortgage note.
The HUD-1 settlement statement reflected a contract price of $6 million, which would be reduced to $5.675 million if Sharma received funds from his investors. Sharma claimed that in exchange for the $400,000 that he was able to tender from his investors at closing, defendants were willing to give up $525,000 in consideration. They would do so by treating the $325,000 note and the $200,000 note as inoperative. According to Sharma, defendants were willing to do this because they wanted more immediate cash.
Conversely, Jashvant denied that the aggregate purchase price for the Inn property and the adjoining parcel ever dropped below $6 million. Both Jashvant and Sunil insisted that defendants never agreed that any of the promissory notes would be inoperative.
Although the amendment to the contract of sale did not mention the $200,000 note, Sunil and Jashvant claimed that this was because the amendment had been prepared prior to January 20, 2003, and because it was not until the very last day that Sharma knew whether or not he would need the extra $200,000. Only the $715,000 mortgage note appeared on the HUD-1 settlement statement because that was the only note with the corporate plaintiff. The other three notes were signed by Sharma individually.
Sunil and Jashvant both admitted that, despite the reference in the escrow agreement to a check for $200,000, they never actually wrote a check to Sharma in that amount. Likewise, Sharma never returned a check in that sum to them. Defendants could not satisfactorily explain why only the $200,000 note, according to the letter agreement, was supposed to involve an exchange of checks, other than to suggest that the bank may have wanted it to look like the money came from the buyer rather than from the seller. In the end, no checks for $200,000 were exchanged.
In his testimony, Patel, the real estate broker, was not able to shed much light on these issues. He claimed that the parties had agreed to a total price for both parcels *854 of $5,675,000 and that, correspondingly, he had agreed to reduce his commission from $180,000 to $150,000.[4] Ultimately, Patel admitted that he was not involved in the final price negotiations and that he never saw the final executed contracts.
Milan Patel ("Milan"), a New York real estate attorney, assisted defendants' local attorney in this transaction and served as the escrow agent. Milan claimed that the transaction could not have "zeroed out" without all four promissory notes being operative. However, Milan admitted that he had no personal knowledge of the parties' transaction and that he essentially was a subordinate participant in the deal.
Philip Rosenbach was plaintiffs' attorney for the transaction and acted as the closing agent. Contrary to his client's recollection, Rosenbach testified that the January 20 amendment to the contract of sale did not change the original aggregate purchase price of $6 million. Rosenbach was not aware of any oral amendments to the contract, nor of any change in the purchase price after the original contract was signed on July 18, 2002. All drafts of the contract originated from defendants' attorneys, not from Rosenbach. Rosenbach was not involved in any price negotiations.
Rosenbach was unaware of any discussions regarding the promissory notes being treated as invalid, inoperative, or cancelled. It was not until late 2003, or early 2004, that Sharma told Rosenbach that some of the notes signed at closing were not "real" notes. This was also when Sharma told Rosenbach that he believed defendants had perpetrated a fraud regarding the purchase price.

Post-Purchase Events and Plaintiffs' Discovery of the Past Revenue from Info Source
After the sale, the day-to-day operation of the Inn continued to be performed by Raymond Maxwell, who had been the general manager of the Inn since 1995. In December 2003, Maxwell advised Frick, who lived in California, that the Inn was not going to achieve the same revenues that defendants had achieved in 2001.
After some investigation, Frick and Maxwell discovered that approximately $60,000 had been received by defendants in 2000 for a block of rooms reserved by a company called Info Source, and that $149,883 apparently had been received in 2001 from this same group. Although Maxwell believed that Info Source also had booked rooms in 1999, he could not access any group booking information for that year due to a technical problem with the Inn's computer program.
According to Maxwell, he became responsible in 1998 or 1999 for making the bank deposits for the Inn. He first learned about Info Source in 1999 when Nimesh, to whom Maxwell reported, asked him to book rooms for the group. Nimesh told Maxwell that the group was from New York and needed to budget a certain amount of money for lodging expenses. No one from the group ever came to occupy any of the reserved rooms. Nevertheless, the money paid for these rooms was booked to the revenue of the Inn.
Contrary to the Inn's usual procedures for other groups booking rooms, there was no written group contract for Info Source, no advance deposit, and defendants did not require full payment from Info Source prior to the guests' expected arrival date.
Maxwell never directly received any payment from Info Source. Instead, Nimesh made the deposits for Info Source and showed Maxwell only the bank receipts. Maxwell never saw backup documents *855 for these deposits, and he did not know whether Info Source paid by cash or check.
As part of his post-purchase discussions with Maxwell, Frick discovered that for 2001, the average ADR for the Info Source rooms was $193.15, and that on some dates the ADR was as high as $278. By comparison, the ADR for the Inn's non-Info Source rooms in 2001 was only $46. A similar disparity existed for the previous year, 2000, when Info Source's ADR was $100, at a time when the Inn's ADR was $44.
Frick immediately wrote to Nimesh, and then to Sunil, regarding what he had learned from Maxwell. He asked them for copies of checks from Info Source as well as their group contract and any contact information for them. When he did not receive any response, Frick accused them of willful misrepresentation regarding this "phantom income." Frick demanded that they retain their records for the years 2000 through 2002, in anticipation of litigation. Sunil responded with a denial of any wrongdoing, and he advised Frick that the matter would be turned over to an attorney.
In his testimony, Nimesh, who had no official title at the Inn, insisted that the revenue from Info Source was legitimate. He explained that he had met an individual by the name of Peter Ready in mid-2000 in one of the hallways of Sunil's office building in Edison. Ready told Nimesh that he was doing a marketing plan in Atlantic City and needed some hotel rooms. Although Ready said he worked in New York City, he did not give Nimesh the name or address of his company.
When Nimesh ran across Ready a second time, Ready supposedly told him that he needed rooms for December 2000. Although Nimesh tried to get Ready to sign a group contract, Ready allegedly did not want to get bogged down with a contract, and Nimesh decided not to push him for one. When Nimesh again asked Ready for contact information, Ready replied that it would be better for him to contact Nimesh since he was always on the road.
Ready booked 600 rooms at the Inn for December 2000, at ADRs much higher than those otherwise in effect. Ready explained to Nimesh that he had a marketing budget that he had to maintain. Nimesh assumed that if Ready did not use the money in his budget, he would lose it.
According to Nimesh, Ready did not pay for the December 2000 booking until early 2001. He made the payments in cash installments, in sums ranging from $5000 to $9000. Ready would either hand Nimesh an envelope when he saw him at Sunil's building or he would leave the envelope for Nimesh with someone in Sunil's office. Inside the envelope would be a post-it note with Info Source's name on it. Ready never called in advance to say he was coming.
In July 2001, Ready booked additional rooms at the Inn through Nimesh. Again, Ready was aware that he was being charged more than the regular room rate, but he supposedly did not mind. As before, Ready paid by leaving Nimesh cash in an envelope. The same process was repeated in October, November, and December 2001. In mid-2002, Ready told Nimesh that his marketing program had finished. Nimesh assumed that Ready would not be booking any rooms after that. He never saw Ready again.
Nimesh admitted that nobody ever showed up to occupy the rooms that Info Source had booked. He acknowledged that his making of the deposits for Info Source was contrary to the normal routine for the Inn. The deposits were made by Nimesh in amounts ranging from $5000 to *856 $9000. Nimesh was aware of IRS regulations that require a bank to report any cash deposits of $10,000 or more.
In retrospect, Nimesh conceded that he had used "bad judgment" in his dealings with Ready. However, he denied that he had any obligation to tell plaintiffs about Info Source at the time of the sale of the Inn. As he saw it, plaintiffs were buying a future business and not a replica of what was done in the past. Nimesh stated that he took all the original daily reports and bank statements for the Inn with him after the Inn was sold. However, a flood in his basement in early 2004 allegedly destroyed all of those records.
Sunil denied that he had any knowledge of Info Source until Nimesh told him about the account in December 2003, upon receiving Frick's letters. Sunil admitted that the money received from Info Source had been booked as income and that revenue was included in the financial records given to plaintiffs. He also admitted that what Nimesh had done sounded suspicious and that there was no logical explanation for it. However, Sunil insisted that he believed his brother's version of what had transpired.
Jashvant admitted that the money received from Info Source should have been labeled as something other than ordinary revenue. However, he maintained that it did not affect the sale of the Inn because no money had been received from Info Source in 2002, the year of the sale.
Frick calculated for plaintiffs what effect the Info Source revenue had upon his earlier pro forma calculations. According to Frick, if the Info Source revenue in 2000 were excluded, the Inn's net income for that year would have been $86,000, instead of $151,859. Likewise, if the Info Source revenue were subtracted for 2001, the Inn's net income would have been $28,573, instead of $200,193. Frick contended that had these been the income numbers available when he prepared his pro formas, he would not have recommended purchasing the Inn. If the capitalization ratio of 10.5% Frick used in his pro formas were applied to the amount of revenue attributed to Info Source in 2001, or $149,883, the value of the Inn would have correspondingly decreased by $1,426,981.
In 2003 (the first year plaintiffs owned the Inn, except for the first three weeks of January), the Inn generated a net income of only $103,000 after amortization and depreciation. In 2004 its net income was $70,095. For 2003, 2004, and 2005, plaintiff showed losses for the Inn on its tax returns.
Frick admitted that he had not seen the Integra appraisal until after closing. However, he did not perform any further due diligence after Sharma told him about the Integra appraisal. Nimesh never provided him with the 2002 profit and loss statements for the Inn, even though he had requested them.
Even though defendants had allocated a large amount of the value of the transaction to good will, Frick admitted that he had "limited knowledge about how good will works." Frick did not know that there was an adjacent parcel of land being sold as part of the transaction until this litigation began. Frick did not receive the bank's inspection and engineering report, which showed what work needed to be done at the property, until after closing. He also was unaware that Sharma had signed personally for the $250,000 promissory note, rather than it being executed on behalf of the LLC.

The Competing Experts on Damages
Plaintiffs' damages expert, Sander Greenberg, is a CPA and forensic accountant. He had previously evaluated hotels, casinos, and other hospitality areas. *857 Greenberg was not, however, a certified appraiser, and the last time he had evaluated a hotel was in the 1980s.
Greenberg looked at the financial documents that had been provided to plaintiffs before purchasing the property. He determined the net operating income of the Inn for 1999 through 2001 and made an adjustment for the so-called "phantom" room revenue for 2000 and 2001. Using a capitalization rate of 10.5%, he determined that the Inn and both parcels of land had a value of $4.165 million as of November 2002.[5]
Greenberg opined that plaintiffs' damages would be the difference between the $4.165 million valuation and the amount of Integra's appraisal ($4.9 million), or $735,000. This sum represented the shortfall between the bargain that plaintiffs entered into, believing that the Inn was worth at least $4.9 million, and the bargain plaintiffs could have entered into if the Inn was worth only $4.165 million. His opinion was based on plaintiffs having relied on the Integra appraisal in good faith.
According to Greenberg's expert report, his damages figure of $735,000 represented:
the overvaluation of the property in the initial appraisal as a result of relying on flawed historical data with respect to the alleged fraudulent revenue reported, use of incorrect assumptions with respect to average daily room rates and occupancy rates which are not supported by the historical and comparable data, inappropriate rounding techniques, and by adjustments for overstatement of historical expenses resulting from various errors made in the combining of expenses for analysis.
As support for the reasonableness of his damage estimate, Greenberg noted that Frick's pro forma calculations in 2002 would have been reduced by $1.4 million if the phantom revenue attributed to Info Source from prior years had been factored out.
Greenberg admitted that determining value based on a formula of three times gross revenue, as Frick had done, was a rudimentary method and not one that any reasonable appraiser would use. Greenberg also admitted that, under his theory, if plaintiffs were able to re-sell the Inn for an amount that would enable them to attain the anticipated return on investment, then they would not be entitled to any damages. He further admitted that defendants had not promised plaintiffs any particular rate of return on their investment. However, Greenberg maintained that plaintiffs still overpaid for the Inn.
Based on defendants' representation to counsel that they would not object to Greenberg's testimony on the ground that he was not an appraiser, plaintiffs declined to have their real estate appraiser testify at trial because such testimony would be cumulative. Plaintiffs' counsel proffered that, had he testified, the realty appraiser's analysis of damages would have been akin to Greenberg's.
Defendants' expert on damages, Fred Giuliano, is a CPA who had experience in valuing businesses, including hotels. Giuliano did not perform an independent valuation of the Inn. Rather, Giuliano critiqued the valuations prepared by Frick. He also was retained to assess the damages that *858 could have resulted from the allegedly-improper inclusion of income from Info Source in the Inn's 2001 and 2002 financial documents.
According to Giuliano, it was significant that, although there was no Info Source revenue in 2002, the Inn's revenues for that particular year ($2,014,446) were actually $120,000 higher than the amount plaintiffs thought the Inn was producing at the time of purchase. This comparison suggests that plaintiffs thought they were purchasing a hotel generating $1,894,000 of income (which included Info Source) when, in fact, the Inn generated $2,014,000 in actual income in 2002, without any Info Source revenue.
Giuliano determined that the Inn's average annual gross revenue from 1999 through 2002, as reduced by the Info Source income, was $1,891,000. Multiplying that number by three, Giuliano opined that plaintiffs sustained no damage when they paid $5.725 million for the property.[6] He stated that "based on the way Frick valuated [sic] the hotel, that the amount that they paid even without the Info Source revenue when applying his assumptions would have more than supported the price that they paid, so I don't think there's any damages."
In performing his analysis, Giuliano essentially took the actual revenues realized in 2001 without the Info Source income, applied the assumptions made by Frick when he generated his pro forma calculations, and then factored those results into the 2002 revenues. This supported his conclusion that plaintiffs would have gone forward with this transaction anyway even if they had been given financials that excluded the Info Source revenue. Giuliano also believed that Frick had an incentive to make "the numbers work" because he was going to be paid to help manage the Inn if the deal went through.
Giuliano believed that Greenberg's approach was flawed for several reasons, the primary one being that Greenberg's analysis suffered from a "compounding problem." He maintained that Greenberg should not have considered the effect that the Info Source income had on Integra's appraisal at the same time he made other corrections to that appraisal.
Giuliano also disputed Greenberg's conclusion that, without the Info Source revenue, Frick's pro forma calculation for 2001 revenue would have been reduced by $1.4 million. According to Giuliano, this analysis constituted improper "cherry picking" because it considered only one year of revenues instead of four years and because it looked at only one aspect of the valuation process. Giuliano also noted that, at the time of his testimony, the property was up for sale for $6.2 million.[7] If that sale *859 were consummated, plaintiffs would be getting an amount greater than they had paid, despite having net operating revenues that were less than those previously realized by defendants.

Plaintiff's Complaint and Defendant's Counterclaim
Upon becoming dissatisfied with the Inn's post-closing revenues, plaintiffs filed their complaint in the Law Division. As we have already noted, the complaint alleged that defendants were liable to plaintiffs under the CFA, and also under a variety of common-law theories. For relief under the CFA, plaintiffs sought treble damages and counsel fees pursuant to N.J.S.A. 56:8-19, as well as "appropriate equitable relief."
Defendants' answer admitted that they had entered into a contract of sale with plaintiffs, but denied any wrongful conduct or any liability. Defendants also interposed a counterclaim alleging that plaintiffs were liable for their defaults on the four promissory notes. The counterclaim further alleged that defendants were entitled to a judgment of foreclosure on the real estate and to the possession of the real and personal property that had secured the notes.
After substantial discovery, defendants moved for summary judgment on the ground that certain waiver and disclaimer provisions in the parties' contract allegedly precluded plaintiffs' claims. The trial court[8] denied that motion.
The trial court later entered a pretrial order on September 12, 2006, dismissing plaintiffs' claims against all defendants for breach of the covenant of good faith and fair dealing, as well as their unjust enrichment claim. That order also dismissed all claims against defendant Swati, except for the claim for piercing the corporate veil.

The Trial Court's Findings
The case was tried to the court over ten intermittent days in the fall of 2006. On October 26, 2006, the trial judge issued an extensive oral opinion, in which he found in plaintiffs' favor solely on their CFA claim.
The following day, October 27, final judgment was entered in favor of plaintiffs and against Shan Enterprises, Suniti Corp., Shan Realty, Sunil, Nimesh, Swati, and Jashvant, jointly and severally, in the amount of $2,779,742.72. This amount included compensatory damages in the trebled sum of $2,205,000, prejudgment interest of $183,951.37, and attorneys' fees and costs of $390,791.35. All claims against HJS were dismissed.
With respect to defendants' counterclaim, the judgment stated that the four promissory notes signed by plaintiffs in the respective amounts of $715,000, $325,000, $250,000, and $200,000 were effective, but that plaintiffs, at their option, could treat any balances due on the notes (except the one for $715,000) as satisfied through a credit against the judgment entered under the CFA in their favor.
In its opinion, the trial court found that the contracts for sale reflected a total purchase price for the property of $6 million ($5,725,000 for the parcel including the Inn, and $275,000 for the adjacent parcel). The court ruled that it was "quite clear" that the tax returns and other financial statements provided by defendants to plaintiffs had overstated income earned by *860 the Inn for two of the years prior to 2002. The court noted that the financial analyses performed by Frick on Sharma's behalf projected substantial increases in occupancy rates and revenue that would be earned by the Inn in the three years following its purchase.
The court observed that the Integra appraisal of $4.9 million indicated that the transaction might be worth less than the $6 million contract price. That appraisal made Sharma's ability to get a mortgage more difficult and required him to look to outside sources for financing.
The court recognized that the documents generated at closing were "confusing." The HUD settlement statement "appear[ed]" to be based on a purchase price of $6 million. By comparison, the amendment to the contract, which had been prepared by defendants and which purported to pertain only to the hotel, listed the purchase price of the Inn as $5,725,000. That statement was premised on the receipt of cash in the amount of $4,910,000 and a $715,000 note, and it provided that defendants would accept additional notes at closing in replacement of cash.
The court also commented on the letter agreement executed at the dry closing, which referred to the "give-and-take" of a check for $200,000 and the execution of a note in that amount. According to the court, that letter agreement, which it found was really not an agreement at all, "did not make much sense" and was "suspicious." No witness was able to explain why this document had been generated, and the court could not identify any reason either.
It was clear to the trial court, however, that four promissory notes were exchanged at closing. Despite Sharma's contention that two of the notes were void because there had been an agreement to alter the purchase price, the court found that the discussions on which Sharma relied had occurred before the notes were executed. Thus, the court found that the parol evidence rule prohibited it from considering such alleged earlier discussions. The court found that the terms of the notes themselves were not ambiguous, despite the fact that the context in which they had been executed might be confusing and suspicious. The court also concluded that the parol evidence rule barred plaintiffs' efforts to modify the terms of either the notes or the sales contract itself.
Turning to the Info Source revenue, the court found it "very difficult" to accept Nimesh's claim that this money was legitimate room revenue generated by the Inn. In making this finding, the court underscored that the rooms were booked in advance without any written confirmation, that the rooms were never actually used, that defendants accepted cash for these transactions, and that the cash was received after the dates of the booking. Although defendants reported the cash as income on their tax return, they never alerted plaintiffs to any of these irregularities.
The court observed that whether defendants' conduct constituted fraud under these circumstances turned on questions of credibility. Although Sharma was sometimes difficult to understand, the court found his testimony generally credible. The court also found Frick and Maxwell generally credible.
The testimony offered by defendants, on the other hand, "was very difficult to accept." The judge did not find Jashvant, Nimesh, or Sunil to be credible witnesses. Defendants never produced any witness from Info Source. To believe Nimesh's narrative about Info Source, the court would have to find that "somewhere in the world there was a person who was willing *861 to pay substantially more for a hotel room than the hotel would normally charge to anyone else in the world, a proposition I find extraordinarily difficult to accept." The court perceived Nimesh's testimony to be completely inconsistent with common experience. The court found it difficult to believe anything that Nimesh said. That finding applied equally to his father and brother to the extent that they insisted that they believed him.
Moreover, Jashvant's testimony that the price for the Inn never went below $6 million was belied by the documents produced at trial, including the contract draft that had been prepared by defendants' own attorney. Other testimony offered by Jashvant led the court to conclude that he was not a credible witness.
The court found Sunil's testimony suffered from similar problems. The court noted that Sunil offered no legitimate explanation for his failure to respond to plaintiffs' inquiries when the irregularity with Info Source first arose. The court similarly concluded that he was not a reliable witness.
On the whole, the court was satisfied that defendants had misrepresented to plaintiffs the past income generated by the Inn. The money deposited by Nimesh obviously came from some other source, and the court was convinced that this money was not room revenue. However, the court did not believe that defendants had deposited this money specifically to inflate the income figures for the Inn. Rather, the court believed the defendants were "laundering money," perhaps for themselves or someone else.
The court found that the misrepresentations about the revenues were attributable to Jashvant, Sunil, and Nimesh, and all of the entities with which they were affiliated. The court was satisfied that all three individual defendants knew that the financial documents given to plaintiffs were inaccurate.
Further, the court found that the misrepresentations regarding the Info Source revenue were material and involved a past fact. Even if Info Source actually existed, the court found defendants should have disclosed that the income from Info Source would be non-recurring. Moreover, defendants were aware of the falsity of the information and intended for plaintiffs to rely on it.
However, the court was not firmly convinced that the misleading information played a causal role in plaintiffs' ultimate decision to proceed with the transaction. Although the court was satisfied by a preponderance of the credible evidence (the standard required under the CFA) that plaintiffs would not have proceeded with the transaction had they been given correct information, the court was not persuaded of this by clear and convincing evidence (the proof standard required for a claim based on common-law fraud).
As to the legal question of whether the CFA applied to the parties' transaction, the court noted that the statute applied to sales or advertisements for sale of merchandise and real estate, and that the transaction here involved the sale of real estate. The court also noted that the CFA is not limited to consumers, non-commercial transactions or sellers involved in mass distributions.
Although the judge observed that the CFA "probably" did not apply to the sale of a business, he found that a distinction could be made when, as here, the transaction involved both the sale of a business and the sale of real estate. Although the court recognized that aspects of the sale here involved a business, the court found that the transaction was mainly one for the sale of real estate with improvements attached *862 to it. The court also found significant that defendants owned a variety of commercial properties, making them sellers subject to the CFA.
As to the remedy under the CFA, the court found that rescission was not appropriate under the circumstances here. The court then noted that two types of compensatory damages were available for fraud in connection with the purchase of property. One type, out-of-pocket loss, is calculated by taking the difference between the price paid and the actual value of the property. In the court's view, plaintiffs did not present a viable claim with respect to this type of loss because there was no competent proof in the record of the actual value of the property. The court was not prepared to accept that the value of the property was $6 million, and the Integra appraisal did not constitute an independent appraisal of the property, either then or now.
The second type of damages, the benefit-of-the-bargain approach, compensates a plaintiff for the loss of its reasonable expectations arising out of a transaction. The trial court noted that such damages are calculated by taking the difference between the price paid and the value of the property had the representations made regarding the property been true. Although it considered such damages appropriate here, the court's calculation was made difficult by the fact that the Inn was an ongoing operation, which involved decisions made over time. Plaintiffs themselves recognized that defendants could not be held responsible for the Inn's failure to meet Frick's projections. Those projections were based on more than a simple capitalization of existing income. Rather, they involved projections based on a presumably-better way of running the hotel.
Nevertheless, the court concluded that plaintiffs were entitled under the CFA to the damages that resulted from their overestimating the value of the property, which, in turn, had been caused by defendants' overstatement of the Inn's income.
The court accepted Greenberg's computation of damages. Although Greenberg's analysis had speculative and hypothetical elements to it, the court found it generally met the requirements of the law, particularly those espoused in Zeliff v. Sabatino, 15 N.J. 70, 104 A.2d 54 (1954). The court was thus persuaded that plaintiffs' proofs were specific enough to be treated as an ascertainable loss under the CFA. Hence, their adjudicated damages were $735,000, or when trebled, $2,205,000.[9]
In addition, the court held that plaintiffs were entitled to an award of counsel fees in the amount of $390,000. This sum was the full amount they sought, even though they had not prevailed on defendants' counterclaim for the amounts due under the promissory notes. The judge reasoned that defending against the counterclaim was subsumed within litigating the CFA claim, on which plaintiffs had prevailed.
As to plaintiffs' remaining claims, the trial court found that their claim of unilateral mistake was essentially a species of common-law fraud, which had not been sufficiently proven here. Furthermore, negligent misrepresentation did not apply because this was not a case of negligence but of alleged fraud.
All of the defendants (both the individuals and the entities) were declared liable for the judgment, except for HJS, which the court found had not participated in any *863 wrongdoing. Although Swati (Sunil's wife) had not been directly involved in the transaction at issue here, she was held liable for her general partnership's actions under veil-piercing principles.
With regard to defendants' counterclaim, the trial court found plaintiffs responsible for the amounts due under the four notes, but not for the default interest rates that defendants had charged. The court did confer upon plaintiffs the right to offset any monies due defendants under all of the notes (except the $715,000 mortgage note) with the amounts due to plaintiffs under the terms of the judgment. The $715,000 note would remain in effect and defendants were not entitled to foreclose on the mortgage.
With prejudgment interest computed in the amount of $183,951.37, the total judgment in plaintiffs' favor totaled $2,779,742.72. After an offset for the three promissory notes, approximately $2 million remained due.
Both parties moved for reconsideration on separate grounds. Those motions were denied.
Defendants have appealed the judgment entered against them under the CFA. Plaintiffs, in turn, have cross-appealed from: (1) the September 2006 pretrial order dismissing their claims for breach of an implied covenant and for unjust enrichment; (2) those portions of the final judgment that enforced the promissory notes, failed to find defendants liable on plaintiffs' remaining causes of action, failed to award plaintiffs out-of-pocket damages, and did not allow plaintiffs to offset the $715,000 note against the judgment; and (3) the order denying their motion for reconsideration.[10]

II.
In considering the legal and substantive issues raised on appeal, we stress at the outset our limited scope of review of the trial court's findings of fact, which were meticulously rendered after this lengthy bench trial. It is well-settled that the factual findings of a trial judge sitting without a jury are "considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974).
We are satisfied from our review of the copious record, much of which is riddled with conflicting testimony and somewhat confusing documents, that the trial court's factual findings here are amply supported by the evidence. The trial judge expressed in considerable detail his assessments of credibility. They bore upon his ultimate findings about how this transaction was generated and the significance of the events that both preceded and followed the sale. We will not second-guess those careful assessments.
In our ensuing analysis of the legal issues, we therefore adopt the trial judge's findings of fact in their entirety, including the critical finding that plaintiffs had proven fraud only by a preponderance of the evidence and not by the clear-and-convincing degree required under the common law.

A.
We examine first the trial court's legal conclusion that this transaction fell within the ambit of the CFA.
*864 We begin with a textual review of the statute. According to N.J.S.A. 56:8-2:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser.
[(Emphasis added).]
The CFA defines "merchandise" to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale[.]" N.J.S.A. 56:8-1(c). The Act defines "person" to include "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof[.]" N.J.S.A. 56:8-1(d). It defines "sale" to include "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute[.]" N.J.S.A. 56:8-1(e).
The CFA was originally enacted to address "rampant consumer complaints about fraudulent practices in the marketplace and to deter such conduct by merchants." Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 245, 872 A.2d 783 (2005). In 1971, the Act was amended to add, among other things, a provision allowing a private right of action and allowing a successful plaintiff to collect treble damages, attorneys fees, and costs. That remedial provision, N.J.S.A. 56:8-19, provides as follows:
Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.
[(Emphasis added).]
We are mindful that the CFA is remedial legislation and should be liberally construed to accomplish its dual objectives of deterrence and protection. Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139, 741 A.2d 591 (1999).
Although N.J.S.A. 56:8-2 uses the phrase "unconscionable commercial practices," the unlawful practices enumerated in that provision are expressed in the disjunctive and are not limited to "unconscionable commercial practices." Cox v. Sears Roebuck & Co., 138 N.J. 2, 19, 647 *865 A.2d 454 (1994). Under N.J.S.A. 56:8-19, a private action may be brought when a person suffers an ascertainable loss "as a result of the use or employment by another person of any method, act, or practice declared unlawful" under the statute.
Despite the CFA's reference to "real estate" in Section 8-2, our courts have adopted a limited construction of the Act's applicability to real estate transactions. For example, in Di Bernardo v. Mosley, 206 N.J.Super. 371, 374, 502 A.2d 1166 (App.Div.), certif. denied, 103 N.J. 503, 511 A.2d 673 (1986), we held that the Act did not apply to the isolated sale by a homeowner of a single-family home. We noted in Di Bernardo that the CFA was intended as a response only to public harm from the "`deception, misrepresentation and unconscionable practices engaged in by professional sellers seeking mass distribution of many types of consumer goods[.]'" Id. at 376, 502 A.2d 1166 (quoting Kugler v. Romain, 58 N.J. 522, 536, 279 A.2d 640 (1971)).
Kugler was decided before the enactment of the private right of action in N.J.S.A. 56:8-19 and dealt only with the Attorney General's authority to prosecute actions in the public interest either on behalf of individually named buyers or in the nature of a class action on behalf of all similarly situated buyers. 58 N.J. at 539, 279 A.2d 640. Nevertheless, the language from Kugler alluding to "professional sellers seeking mass distribution" of their goods, has been frequently cited when our courts have had to address the statute's intended reach. Id. at 536, 279 A.2d 640.
For example, in Strawn v. Canuso, 140 N.J. 43, 59-60, 657 A.2d 420 (1995), our Supreme Court cited both Kugler and Di Bernardo with approval, in holding that, in the context of realty sales, the CFA was limited to professional sellers of real estate and to brokers, agents, and salespersons representing such professional sellers. See also Byrne v. Weichert Realtors, 290 N.J.Super. 126, 134, 675 A.2d 235 (App. Div.) (holding that the CFA does not apply to non-professional sellers of real estate, but does apply to brokers, agents, and salespersons who represent such non-professional sellers), certif. denied, 147 N.J. 259, 686 A.2d 761 (1996).
The trial court in the present case found that defendants were not involved in the isolated ownership, use, and sale of one piece of real estate. Rather, they owned a variety of commercial properties, which they apparently bought and sold for investment purposes. Even so, that particular finding by the trial court is not dispositive of whether the CFA applies to the parties' transaction here as a whole.
We concur with plaintiffs that they were not precluded from seeking relief under the CFA merely because they purchased the Inn for investment purposes. In Hundred East Credit Corp. v. Eric Schuster Corp., 212 N.J.Super. 350, 355, 357, 515 A.2d 246 (App.Div.), certif. denied, 107 N.J. 60, 61, 526 A.2d 146 (1986), we held that nothing in the CFA suggests it is inapplicable to the sale of merchandise for the use in business operations and that a business entity can be a consumer and can be victimized by unlawful practices. Similarly, in Marascio v. Campanella, 298 N.J.Super. 491, 498-99, 689 A.2d 852 (App. Div.1997), we held that the Act extends to the purchase of merchandise for use in business operations and for investment purposes.
However, in Papergraphics International, Inc. v. Correa, 389 N.J.Super. 8, 13-15, 910 A.2d 625 (App.Div.2006), we held that the Act did not apply to the bulk sale of counterfeit ink-jet printer cartridges to a corporate plaintiff, which intended to resell the cartridges at a significant profit. In our analysis in Papergraphics, we focused *866 on the quantity of items purchased, the wholesale nature of the transaction, plaintiff's status as an experienced commercial entity with relatively equal bargaining power compared to defendant, and the steps plaintiff had taken to guard itself against the possibility of purchasing counterfeit goods. Ibid.
The core legal issue that arises here is whether the CFA was intended by the Legislature to apply to a sale of an ongoing business, where the sale includes real property connected to that business. The trial court did not squarely resolve that legal issue. Instead, the court determined that although elements of the transaction here involved the sale of a business, it was essentially one for the sale of real estate with improvements attached to it. We disagree with the court's legal classification.
The record as a whole shows that what defendants essentially sold to plaintiffs was an ongoing business, i.e., a motel, along with the land on which it was situated and an adjoining parcel. Plaintiffs bought the property with the intention of continuing to operate the business as a motel. This was not a situation where a buyer purchased a piece of real estate with the intention of razing the business premises situated on the property, or shutting down the business, or converting the building to a different use.
Moreover, the record is devoid of proof that either side of this transaction haggled over or focused upon the intrinsic value of the real estate. Both Sharma and Frick asserted that their focus was upon the income produced by the motel and its potential to generate revenues in the future. At no time did they ever mention in their testimony the value of the real property that was being sold along with the motel. Plaintiffs chose not to offer the testimony of a real estate appraiser. Their expert at trial was an accountant, whose testimony, as did that of the defense expert, focused upon the value of the ongoing business.
As we have noted, Integra, acting as the bank's appraiser, valued the real estate at $3,685,000, the furniture, fixtures and equipment at $715,000, and the business and other intangibles at $500,000. However, in Section 3.01 of the contract of sale, the parties broke down the purchase price for the motel property as follows: only $2,300,000 for the premises and improvements; $175,000 for personal property; and $3,250,000 for good will. Hence, the parties themselves characterized the good will of the motel as being the most valuable component of this transaction.
More significantly, the alleged fraud which formed the basis for plaintiffs' cause of action pertained only to the operation of the motel. The fraud had nothing to do with the real estate. The fraud pertained solely to defendants' misrepresentations regarding the past income of the motel, specifically the room revenue from Info Source. Although plaintiffs later discovered problems with the physical condition of the property as well, especially when they tried to re-sell the property, those later-identified problems did not form the basis for their cause of action originating from the defendants' pre-sale representations.
Although the CFA should be read liberally and broadly, it "does not cover every sale in the marketplace. Rather, CFA applicability hinges on the nature of a transaction, requiring a case by case analysis." Papergraphics Int'l, Inc., supra, 389 N.J.Super. at 13, 910 A.2d 625.
In BOC Group, Inc. v. Lummus Crest, Inc., 251 N.J.Super. 271, 277-78, 597 A.2d 1109 (Law Div.1990), the court had to decide whether "merchandise" under the CFA encompassed a licensing agreement for a complex petroleum refining process. *867 In concluding that such a licensing agreement was not a "service" within the definition of "merchandise" in N.J.S.A. 56:8-1(c), the court held that what had been sold was an idea or a design. Id. at 278, 597 A.2d 1109. Any services rendered to the plaintiff under the licensing agreement were collateral to the sale of a new process to produce needle coke. Ibid. Moreover, even if the new process was a service, it was not the type of service contemplated by the Act and it was not sold or capable of being sold "to the public." Ibid.
The court noted in BOC Group that the litigation was between multi-million-dollar international corporations dealing with complex state-of-the-art technology in a very esoteric field, and that the plaintiff knew it was buying an idea that was still experimental. Id. at 278, 280, 597 A.2d 1109. The court also noted that the complex design in question bore no similarity at all to any of the twenty-one types of consumer transactions identified by the Division of Consumer Affairs in the regulations it promulgated pursuant to the CFA. Id. at 280, 597 A.2d 1109; see N.J.A.C. 13:45A-1 to -29.
In Kavky v. Herbalife International of America, 359 N.J.Super. 497, 498-500, 820 A.2d 677 (App.Div.2003), we considered the CFA's applicability to facts involving the defendant's use of general advertising over the Internet to solicit distributors for a variety of products it sold. The plaintiff paid to become a distributor and then sued when it found out that, contrary to the defendant's representations, the defendant never intended to send the plaintiff any pre-paid retail Internet customers. Id. at 499-500, 820 A.2d 677. We held in Kavky that franchises and distributorships may come within the Act's definition of merchandise when they are not otherwise covered by the Franchise Practices Act and when they are offered to the general public. Id. at 501, 820 A.2d 677. In contrast to the case at bar, we found that the investment in a franchise was "not really the acquisition of a business" and was "certainly not an investment in a going concern." Id. at 507, 820 A.2d 677.
In J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1271 (3d Cir.1994), the United States Court of Appeals for the Third Circuit predicted that the New Jersey Supreme Court would not include franchises within the CFA's definition of "merchandise." The Third Circuit observed in J & R that franchises were "`wholly foreign to any of the listed examples specifically referred to in the definition.'" Id. at 1272 (quoting Neveroski v. Blair, 141 N.J.Super. 365, 379, 358 A.2d 473 (App.Div.1976)).
We need not re-examine Kavky here, or address the Third Circuit's competing prediction in J & R of how our Supreme Court would ultimately treat franchise transactions under the CFA. The present case did not revolve around either a distributorship or a franchise. Although plaintiffs did purchase, among other things, the right to continue the Comfort Inn franchise, it was not the franchisor who misrepresented anything to them in terms of any goods or services provided in accordance with the franchise agreement. Rather, plaintiffs here were allegedly defrauded by false assurances given to them by the prior operators of the motel, indicating that the business was able to generate a certain amount of revenue based on its past performance. Such false assurances did not relate to any good, service, or commodity offered to the public for sale.
In contrast to the situation in Kavky, defendants here did not solicit plaintiffs to distribute goods on their behalf. Further, unlike Kavky, this is indeed a case involving "the acquisition of a business." *868 Kavky, supra, 359 N.J.Super. at 507, 820 A.2d 677.
We discern no textual basis in the statute or other reason to expand the scope of the CFA to transactions that, at their core, involve the sale of an ongoing business from one group of proprietors to another. If the Legislature had intended to extend the statute's reach that far, it knew how to draft the words that would accomplish that goal. DiProspero v. Penn, 183 N.J. 477, 506, 874 A.2d 1039 (2005) (observing that if the Legislature intends to include something not presently within the text of a statute, "then it must draft a statute that accomplishes that end"). It strains reason to construe the Act's references to "merchandise" to this particular kind of transaction.
Defendants sold plaintiffs a motel business, not "objects, wares, goods, commodities, services," or "anything offered, directly or indirectly, to the public for sale." N.J.S.A. 56:8-1(d). The real estate was incidental to the motel business that was the gravamen of plaintiffs' claims of fraud. Hence, the CFA's limited application to certain real estate transactions is of no avail to plaintiffs here. Although we recognize that the conduct of defendants was far from exemplary, the statute simply does not cover this situation.
We therefore conclude, as a matter of law, that the CFA does not apply to the parties' transaction in this case. Consequently, we reverse the judgment rendered for plaintiffs under the CFA.
[At the direction of the court, the published version of this opinion omits Parts II(B), III, IV, and V, which relate to issues other than the applicability of the CFA to the parties' transaction. See R. 1:36-3.]

VI.
For the reasons we have stated, the judgment in favor of plaintiffs under the CFA is reversed, including the award of damages and counsel fees. We affirm the dismissal of plaintiffs' common-law claims and the judgment in favor of defendants on their counterclaim on the four promissory notes. The matter is remanded for the entry of a corrected final judgment consistent with this opinion.
NOTES
[1] The calculation yields an actual figure of $1,824,270, before rounding.
[2] Narang, Frick, and Blasi are not parties to this litigation.
[3] Sharma mistakenly claimed that this amendment pertained to both parcels, i.e., the Inn property and the adjacent parcel. However, the only contract entered into between Shan Enterprises and Sharma was the Inn contract.
[4] Jashvant claimed, to the contrary, that Patel's commission was $150,000 from the start.
[5] Greenberg also provisionally calculated what he called "rescission damages," i.e., the amount plaintiffs had spent on the property and would be entitled to as damages in the event the court rescinded the contract. We note that since the trial court's denial of rescission is not at issue on this appeal, this provisional calculation is not relevant to our analysis.
[6] Giuliano admitted that, in doing his calculations, he had "normalized" income for 2001 to account for the adverse market impact of the events of September 11 of that year.
[7] At the time of trial, there was a pending contract of sale of the Inn (including both parcels of land) for the purchase price of $6.2 million. However, according to Rosenbach, also pending at the time was federal litigation against plaintiffs, based on the Inn's alleged non-compliance with the American With Disabilities Act, 42 U.S.C.A. §§ 12101-12213. That litigation, in addition to the present litigation, could result in cancellation of the contract of sale. Further, the subsequent contract purchasers had raised issues regarding the buckling of the parking lot and the demolition of the building on the adjacent parcel. According to Sharma, there was a boarded-up dilapidated motel on the adjacent parcel. After plaintiffs purchased the property, it received a demolition notice regarding this motel. Although Sharma "wish[ed]" defendants had told him that the motel had to be demolished, concealment of the physical condition of the property was never part of plaintiff's claims against defendants. After the close of evidence at trial, it was reported that, because the contract purchasers subsequently discovered more serious problems with the condition of the property, they opted to terminate the contract. On the advice of counsel, Sharma chose not to oppose that termination.
[8] The judge who ruled on that motion was subsequently reassigned, and all further decisions in the case were rendered by the judge who ultimately tried the case.
[9] The trial court corrected its oral opinion's mathematical error in the trebling when it entered final judgment.
[10] Although their notice of cross-appeal set forth additional portions of the final judgment from which plaintiffs were seeking review, those claims have not been briefed and are therefore deemed abandoned. In re Bloomingdale Convalescent Ctr., 233 N.J.Super. 46, 48 n. 1, 558 A.2d 19 (App.Div.1989).